# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 28, 2001

## STATE OF TENNESSEE v. MARK A. CALDWELL

### Direct Appeal from the Criminal Court for Hamilton County
### Nos. 220673, 220675    Gary D. Gerbitz, Judge, Sitting by Designation

---

### No. E2001-00321-CCA-R3-CD
### February 11, 2002

---

The defendant was convicted of first degree premeditated murder, first degree felony murder, and especially aggravated robbery, with the murder convictions merged into a single conviction for first degree murder following the jury's verdict. The jury sentenced him to life imprisonment on the murder conviction, and the trial court sentenced him to twenty-two years on the especially aggravated robbery conviction, to be served concurrently to the life sentence. Following the denial of his motion for a new trial, the defendant filed a timely appeal to this court, raising four issues: (1) whether the evidence was sufficient to support his convictions; (2) whether the trial court erred in allowing testimony about a statement of denial he made to police; (3) whether the trial court erred in allowing a photograph of the victim's body to be introduced into evidence; and (4) whether the jury should have been instructed that the State had taken the position, in a dismissed conspiracy indictment, that the defendant's accomplice was the shooter. After a careful review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

John C. Cavett, Jr., Chattanooga, Tennessee, for the appellant, Mark A. Caldwell.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William H. Cox, III, District Attorney General; and Rodney C. Strong, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On December 9, 1997, the victim, Roy Hunter, was robbed and shot to death outside his trucking business in Chattanooga. On April 22, 1998, following an investigation by police, the defendant, Mark A. Caldwell, and his cousin, Lavaya Lee, were each indicted by the Hamilton

County Grand Jury on one count of first degree premeditated murder, one count of first degree felony murder, one count of especially aggravated robbery, and one count of conspiracy to commit murder. In the conspiracy indictment, the State alleged that Lee was the shooter of the victim. Subsequently, the conspiracy charges were dismissed, and the men were tried separately on the remaining counts of the indictments.

The defendant's trial was held September 19- 22, 2000. Chattanooga Police Officer Michael Hart, the first officer on the scene of the crime, testified that he was dispatched at 10:51 p.m. on December 9, 1997, to respond to a report that a truck driver had been shot at 16th and Long Streets. When he arrived at the scene at approximately 10:55 p.m., he saw a tractor-trailer truck, with its engine running, sitting "bobtail" (*i.e.*, without a trailer attached) on Long Street in front of a business called Hunter Transport and across from a bar known as Skeezer's Lounge. The truck cab was empty, and a search of the large parking lot behind the lounge revealed no one. Returning to the truck, Officer Hart then noticed that the gate leading into Hunter Transport was open, although the business was dark and appeared to be closed. Upon further investigation, he discovered the victim lying on his back behind a van parked in the business's driveway. Stacks of tires and tire rims, as well as the van, hid the body from view from the street.

Officer Hart testified that there was "lots of blood" beneath the victim's left upper leg and head, and it was apparent that he was dead. The victim's wallet and a set of keys were found about a foot to a foot and a half from his side. Two fresh shell casings were discovered approximately fifty to sixty feet from the victim's body, in the parking lot of Skeezer's Lounge, but the murder weapon was not found. Officer Hart identified several photographs of the crime scene, including one of the victim's body, which were introduced into evidence and published to the jury.

Ossie Poke, who ran an automobile repair business about a block and a half from Hunter Transport, testified that he heard two distinct gunshots, "seconds apart," at about 9:30 p.m. on December 9, 1997.

The victim's brother and business partner, Thomas Hunter, testified that he last spoke to the victim by telephone at 5:59 p.m. on the evening of his murder, at which time the victim told him that he was driving to Newport, Tennessee, to deliver a trailer. He said that the victim had cashed a check for $1400 the Saturday before he was killed, and that it was normal for him to take cash on trips to pay for his travel expenses. Hunter estimated that the round-trip to Newport normally took about five and a half hours. He testified that the victim carried his wallet in his left back pocket with the button buttoned and his keys in his left front pocket. He said that the van at the murder scene was the victim's, which the victim had intended to drive home after parking the truck at the business.

Claudette Richmond testified that the defendant and Lavaya Lee are both her cousins. On December 9, 1997, the two men picked her up at a friend's house and drove her in the defendant's car to the home of his sister, Christy Ash. She, Ash, Lee, and the defendant then went in the defendant's car to Skeezer's Lounge. Richmond said that she drove and Ash sat in the front passenger seat, while the defendant and Lee sat in the back. At some point during the trip, the defendant asked her to pass him a gun that was underneath the floor mat, and she complied.

Richmond testified that after they had been at the lounge for a while, she saw the defendant and Lee leave, but she was unsure if the men left together or separately. Later, the defendant came back in alone and told her and Ash that they needed to leave. The three of them left in a hurry, going outside and getting into the defendant's car where they were joined by Lee. She said that the defendant got into the driver's seat and she got into the front passenger seat, and, at some point, the defendant told her, "We robbed a dude, the truck driver." She testified that they drove from the lounge back to Ash's home, where the defendant divided up some money four ways, giving Richmond a $100 bill. Richmond acknowledged that the defendant had not had any money when he was at the lounge. Although unsure of the exact amount that the defendant gave Lee and Ash, she admitted that each person present got at least $100. She also admitted that the four of them had been drinking alcohol and smoking marijuana during the course of the evening. She testified on cross-examination that Lee had also been using cocaine, and that she had not seen the defendant with a gun when he got into the car as they were leaving the lounge.

Christy Ash, the defendant's sister, testified that the defendant came with Lee and Richmond to her home at about 9 p.m. on December 9, 1997, and that the four of them then drove together to Skeezer's Lounge in the defendant's car. She thought the defendant drove and could not remember anyone having passed a gun from the front to the backseat during the drive. She and Richmond played cards together at the lounge, while the defendant and Lee were both "in and out of the club." At some point, the defendant came back inside and told her, "It's time to go, we need to leave[,]" and she, Richmond, and the defendant went outside and got into the defendant's car where Lee later joined them. Ash testified that Lee, who had a gun, said, "I hope he's not dead," as he got in the car. She admitted that he also said to the defendant, "I'll tell them I done everything[,]" to which the defendant had replied, "It ain't like that. We was in this together." She further admitted that she had seen the gun in the defendant's possession in the past, and that, although he had not had money previously, the defendant had some when they left the lounge.

Ash testified on cross-examination that the defendant periodically went outside to smoke during the hour and a half they spent at the lounge. She never heard the defendant and Lee talk about robbing anyone during the time they were at her home, or while they were at the lounge. She said that the last time she saw Lee leave the lounge he was alone, and that it was sometime after the defendant had gone out. Lee was not there when the rest of them left the lounge and got into the car, but instead came up with the gun as they were getting ready to leave. Ash said that Lee had been using cocaine that evening, and that when he got into the car he kept asking them to take him to buy more cocaine. On redirect, she acknowledged that Lee asked the defendant to give him money to buy the cocaine, and that after arriving back at her home, the defendant and her ex-boyfriend went out to buy more marijuana.

Detective William Kenneth Neblette, the homicide detective assigned to the case, testified that when he first talked with the defendant, approximately twenty-four hours after the murder, he denied any knowledge of the crime. His investigation later led him to Richmond and Ash, and, on January 15 or 16, he went to Ash's apartment. He said that Ash initially identified herself as "Belinda" when he informed her that he was looking for Christy Ash, and told him that the person he was looking for had already left for work. As he was talking with her, he saw the defendant walk

-3-

across the room behind her, and he and the defendant exchanged nods and waves. At some point subsequent to that encounter, the defendant was brought to his office, where he informed him of his constitutional rights and had him sign a waiver of rights form before taking his statement.

The tape recording of the defendant's statement was played before the jury. In his statement, the defendant said that he was outside taking a smoke break when his cousin, who had been "bragging" in the lounge that he needed some money, came outside, saw the victim get out of his truck, went over, put a gun to his head, and demanded money. The defendant said that the victim was "looking like he was trying to take the gun" and would not give up his money, so his cousin "shot him once and he shot him again. And after that he shot him again. I ran over there and he was telling me to see if he had some money so I had to check his pockets and got his wallet."

The defendant said that he took between $450 and $500 from the victim's wallet and threw the wallet down on the ground. He then went to the lounge to get Richmond and Ash, while Lee stayed outside with the victim's body. The defendant said that he told the women that Lee had "just shot somebody," and they left the lounge and went to his car. Lee soon joined them, and the four of them then left the scene. The defendant claimed that Lee had retrieved the gun from his car prior to shooting the victim.

The State's final witness was Dr. Frank King, the Hamilton County Medical Examiner. Dr. King, who supervised and assisted in the autopsy of the victim's body and completed the autopsy report of investigation, testified that the cause of death was multiple gunshot wounds. He said the victim suffered three gunshot wounds, caused by two separate bullets: (1) an entrance wound in the left side of the face caused by a bullet that entered the jaw and continued in a downward path through the right subclavian artery, right first and second ribs, and right lung before stopping at the right fourth rib; (2) an entrance wound in the groin area caused by a second bullet that entered the body at the upper hip and passed through the left hip bone and left obturator artery; and (3) an exit wound to the back of the left buttock where the second bullet exited the body. Dr. King testified that the hip wound was a contact wound, and that the wound to the face would be classified a distant gunshot wound, which generally means that the gun was two feet or greater distance from the body when fired. He said that the wound to the victim's hip, as well as the wound to his jaw, would have been fatal without prompt medical attention, due to the size of the arteries that were transected by the respective bullets causing those wounds. He estimated that the victim could have survived without medical attention for a half hour or less from the wound to the left obturator artery, and that it would have taken just a "couple of minutes" for the victim's heart to pump blood out of his severed right subclavian artery and fill his chest cavity with blood. Dr. King could not determine in what order the wounds had occurred, but agreed that the gunshot wound to the jaw could have occurred as someone stood over the victim and fired down into his face as he was seated on the ground.

On cross-examination, Dr. King testified that if the victim was lying down when he was shot in the face, the gun would have had to have been held low to the ground in order for the bullet to have traveled in the straight line it took through the victim's neck and chest. He acknowledged that it was possible that the victim was standing up, but doubled over, as he was shot in the face.

No witnesses were presented on behalf of the defendant.

## ANALYSIS

### I.  Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his convictions.  He does not argue that the State failed to show that premeditated murder, felony murder, and especially aggravated robbery occurred, but instead contends that the circumstantial evidence of his guilt was insufficient to show that he was a participant with Lee in the crimes, rather than a mere accessory after the fact.  The State contends that the evidence was more than sufficient to prove the defendant's guilt under a theory of criminal responsibility.  We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979).  See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt.").  The same standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The State argued at trial that even if the defendant was not the shooter, he was guilty of the crimes under a theory of criminal responsibility.  Under Tennessee law, a person may be charged with an offense if "he or she is criminally responsible for the perpetration of the offense."  Tenn. Code Ann. § 39-11-401 (1997), Sentencing Commission Cmts.  A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]"  Id. § 39-11-402(2). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . ., based upon the conduct of another person."  State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. See id. To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

The jury in this case was instructed on the elements of the charged crimes, as well as on the theory of an individual's criminal responsibility for the conduct of another. After deliberating, it found the defendant guilty of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. To obtain a conviction for first degree premeditated murder, the State had to show "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). For the purposes of this crime

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (1997). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1997). To obtain a conviction for first degree felony murder, the State had to prove "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy[.]" Tenn. Code Ann. § 39-13-202(a)(2) (1997). Finally, to obtain a conviction for especially aggravated robbery, the State had to show an intentional or knowing theft of property from the person of another by violence or putting the person in fear, "[a]ccomplished with a deadly weapon[,]" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (1997).

Having carefully reviewed the record, we conclude that the evidence is sufficient to support the jury's verdicts in this case. Viewed in the light most favorable to the State, the proof at trial establishes that the victim was killed during a robbery, shot once with a contact wound to his hip, and then again as someone stood over his fallen body and deliberately fired down into his head and neck. Whether premeditation is present in any particular case is to be determined by the jury upon a consideration of the facts in evidence. Hicks v. State, 533 S.W.2d 330, 334-35 (Tenn. Crim. App. 1975) (citations omitted). Premeditation may be inferred from the circumstances of the killing. Id. From the evidence in this case, a reasonable jury could have inferred the presence of premeditation

in the killing of the victim. The proof further establishes that the defendant had possession of his gun as he and Lee arrived at the lounge, was outside with Lee during the time that the shooting occurred, and shared in the proceeds of the robbery. Richmond and Ash both testified that the defendant had money after leaving the lounge, although he had not had any while at the lounge. Richmond said that the defendant distributed at least $100 to each of them when they arrived back at Ash's home, and Ash said that Lee asked the defendant for money to buy cocaine and later went with her ex-boyfriend to buy more marijuana. As a further indication of his full participation in the crimes, testimony was presented that the defendant admitted his involvement immediately after the shooting, telling Richmond on the drive back to Ash's home, "We robbed a dude, the truck driver," and replying to Lee's offer to take responsibility by saying, "It ain't like that. We was in this together." Thus, in spite of the defendant's attempts to show that Lee acted alone, sufficient evidence was presented from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of first degree murder and especially aggravated robbery based on a theory of criminal responsibility. This issue is without merit.

## II. Admissibility of Evidence of Defendant's Statement of Denial

As his next issue, the defendant contends that the trial court erred in allowing Detective Neblette to testify that he denied any knowledge of the crime when he was questioned the day following the murder. He argues this evidence was irrelevant to any issue at trial and unfairly prejudicial to his case.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, . . . ." Tenn. R. Evid. 403.

The exchange to which the defendant objects occurred during the State's direct examination of Neblette. Neblette said that the evening after the homicide, he spoke with the defendant in the parking lot of Skeezer's Lounge. Presumably, the defendant was not a suspect at that point and, consequently, not advised of his Miranda rights. Defense counsel objected to testimony about the defendant's claim he had no knowledge of the incident, arguing that the statement was hearsay, irrelevant, and not a prior inconsistent statement. As we understand the State's argument at trial, the statement was relevant as to the defendant's credibility, as to the issue of flight, and as to the defendant's willingness "to cover up his involvement by shifting all the blame to Lavaya Lee."

Neblette testified as follows regarding his conversation with the defendant in the parking lot of Skeezer's Lounge the night after the shooting:

Q.     At that point did you ask Mr. Caldwell if he knew anything about the incident or knew anything or had any information about the murder?

A.     Asked him if he knew anything about the incident that happened the previous night and he had no information to add.

Q.     What was his response?

A.     His exact response I don't remember, but it was nothing that I would even make notes about.  He knew nothing about anything, just–

Q.     So he denied any knowledge of it?

A.     Denied any knowledge.

The admission of evidence lies within the sound discretion of the trial court.  See State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998).  We review, this issue, therefore, under an abuse of discretion standard.  Id.

        The State argued at trial that the defendant's statement of denial was relevant to show that he "was willing to cover up his involvement" by first denying knowledge and then shifting the blame to Lavaya Lee.  After reviewing Detective Neblette's proposed testimony, the trial court apparently agreed, allowing the evidence to be admitted.  Subsequently, at the motion for a new trial, the trial court found that the evidence was material because it was inconsistent with the defendant's subsequent statement to police and showed his participation in the crimes.  "A defendant's  . . . attempts to evade arrest are relevant as circumstances from which, when considered with the other facts and circumstances in evidence, a jury can properly draw an inference of guilt."  State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985) (citing Sotka v. State, 503 S.W.2d 212, 221 (Tenn. Crim. App. 1972)).  Inconsistent statements made by a defendant following a crime may also be relevant as raising an inference of guilt.  See Hackney v. State, 551 S.W.2d 335, 339 (Tenn. Crim. App. 1977).

### III.  Admissibility of Photograph of Victim's Body

        The defendant raises as his third issue whether the trial court erred in allowing a photograph of the victim's body to be introduced into evidence.  He contends that the prejudicial effect of this photograph outweighed its probative value and argues that the victim's manner of death, as well as the location of his body, could have been adequately conveyed to the jury through the testimony of the medical examiner and the police officers who investigated the crime.  The State argues that the trial court did not abuse its discretion in allowing the photograph to be admitted into evidence.

The admissibility of photographs generally lies within the sound discretion of the trial court, and will not be overturned on appeal absent a showing that the trial court abused its discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000), cert. denied, 531 U.S. 1082, 121 S. Ct. 786, 148 L. Ed. 2d 682 (2001). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467, 143 L. Ed. 2d 551 (1999); Banks, 564 S.W.2d at 949; Tenn. R. Evid. 401. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. At a jury-out hearing held at the beginning of the trial, the State argued that the photograph was not unnecessarily gruesome and that it was relevant to show the exact location of the victim's body in relation to his office, wallet, and keys, revealing that the victim was hidden from passersby on the street. The trial court agreed, finding that the photograph was not "overly inflammatory in any way" and that its prejudicial effect was not substantial.

The photograph at issue shows the victim lying on his back a few feet from his office door, and behind some stacks of tire rims and other automotive parts. His wallet and keys can be seen lying on the ground approximately a foot or two from his left side. Although there is some blood visible on the ground beside the victim's left hip, as well as on the left side of his face, the photograph does not provide a close view of the victim's wounds. Thus, although unpleasant, it is not particularly gruesome or gory. The photograph was relevant to show the secluded location of the victim's murder and whether his wallet was taken before or after he was shot. We conclude, therefore, that the trial court did not abuse its discretion in allowing this single photograph of the victim's body to be introduced into evidence at trial. This issue is without merit.

## IV. Request for Special Jury Instruction

The defendant raises as his final issue whether the trial court erred by refusing to issue a special jury instruction. Prior to closing arguments in this case, defense counsel requested that the trial court instruct the jury that Lee was the shooter:

> And I guess what I, I guess what I would like to do is to suggest that we have some either an – something like an instruction or statement to the jury that, that the shooting was done by Mr. Lee, not only because that seems to be all of the proof that we have, but also on the grounds of judicial estoppel, because even though the State's dismissed its conspiracy count, indictment in this case, it's, nevertheless it's a pleading in this case, and in this pleading, the State set out the facts to constitute the conspiracy, one of which was of the specific paragraph that said that Lavaya Lee walked over to this location and shot the victim.

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990).  Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)).

In denying the defendant's request for a special jury instruction, the trial court determined that the conspiracy indictment did not bind the State to any position at the defendant's trial, and that the facts did not support an instruction naming Lee as the sole shooter:

> I think that the facts in this case are open as far as whether or not one or the other did the shooting, so therefore, I'll overrule your motion for an instruction.
>
> I think that the factual situation allows both sides to argue either way.  I don't think that – I don't think that there has been any action on the part of the State that would estop them from arguing any further.  You might have had a stronger argument if they would have been proceeding also on the conspiracy count.
>
> Things also, let me mention the fact, things change during trials, facts change, testimony changes, and I don't think by creating an indictment, the State is estopped from eliciting facts from witnesses that might be contrary to their initial charging, which creates one situation, obviously a very, an issue that makes it much stronger for your argument, the defense's argument, but I don't know that it's a situation I'm willing to take away from the jury factually.

The defendant contends on appeal that by taking the position that Lee was the shooter in the indictment charging him with conspiracy to commit murder, and by obtaining a conviction against Lee for premeditated murder in a prior separate trial, the State was estopped from denying that Lee was the shooter at the defendant's trial.  We disagree.

The doctrine of judicial estoppel is designed to prevent a party who has taken one position or sworn to one set of facts in one judicial proceeding from taking unfair advantage of another party by taking a contradictory position or swearing to a different set of facts at a subsequent judicial proceeding.  See Marcus v. Marcus, 993 S.W.2d 596, 602 (Tenn. 1999); Werne v. Sanderson, 954 S.W.2d 742, 745 (Tenn. Ct. App. 1997); Shell v. Law, 935 S.W.2d 402, 408 (Tenn. Ct. App. 1996). The doctrine applies, however, "'only where there has been a willful misstatement of fact–that is, perjury.'"  Werne, 954 S.W.2d at 745 (quoting Woods v. Woods, 638 S.W.2d 403, 406 (Tenn. Ct. App. 1982)).  The doctrine does not apply "where there has been an explanation showing that the previous allegedly contradictory statement was inadvertent, inconsiderate, mistaken, or anything short of a willfully false statement of fact."  Woods, 638 S.W.2d at 406 (citing D.M. Rose & Co. v. Snyder, 185 Tenn. 499, 520, 206 S.W.2d 897, 906 (1947)).  The policy behind the doctrine is to "suppress fraud and prohibit the deliberate shifting of position to suit the exigencies of each

particular case that may arise concerning the subject matter in controversy." Decatur County Bank v. Duck, 969 S.W.2d 393, 397 (Tenn. Ct. App. 1997) (citing Carter v. E.T. & W.N.C. Transp. Co., 243 S.W.2d 505, 509 (Tenn. Ct. App. 1949)).

Although there is a paucity of authorities on this issue, we have found no support for the defendant's contention that the allegations of an indictment constitute a judicial admission by the prosecutor. In United States v. Godwin, 522 F.2d 1135 (4th Cir. 1975), the defendant made a similar claim after a reindictment corrected a mistake in verb tense, in the first indictment, the nature of which defeated federal jurisdiction. Determining that the allegations of the first indictment did not constitute a judicial admission, the court stated:

> Godwin contends that the original defective indictment constituted a "judicial admission" binding on the government and requiring dismissal of a second indictment based on the same facts. Despite the novelty of this argument, the dismissal of the original indictment was neither determinative of any fact in issue nor did it prejudice the government's right to obtain a second indictment which was properly drawn. United States v. Newson (D.C. La. 1966) 144 F. Supp. 464, 466. Nor was there error in the trial court's refusal to admit the original indictment as evidence at trial since the first indictment was not probative of any fact asserted therein. United States v. Glaziou (2d Cir. 1968) 402 F.2d 8, 15, Cert. denied 393 U.S. 1121, 89 S. Ct. 999, 22 L. Ed. 2d 126.

Id. at 1136.

The scant other authorities on this matter are in accord. Falter v. United States, 23 F.2d 420, 425 (2nd Cir. 1928) ("[A]n indictment is not a pleading of the United States, but the charge of a grand jury, and a grand jury is neither an officer nor an agent of the United States, but a part of the court."); United States v. Salerno, 937 F.2d 797, 811 (2nd Cir. 1991) ("An indictment is not admissible as an admission of a party-opponent[.]"), rev'd on other grounds, 505 U.S. 317, 112 S. Ct. 2503, 120 L. Ed. 2d 255 (1992).

Thus, we find no legal support for the defendant's claim of judicial estoppel. Additionally, no evidence was shown that the State attempted to gain an unfair advantage over the defendant by taking a position in his trial that was inconsistent to the position taken in the conspiracy indictment, or that the defendant was prejudiced by the facts alleged in the conspiracy indictment. As the trial court observed, the conspiracy indictment was dismissed prior to the defendant's trial, and the evidence at trial did not preclude the jury's finding that the defendant was the shooter of the victim. Thus, an instruction naming Lee as the shooter would not have been warranted by the facts of the case.

Furthermore, we agree with the State that the defendant failed to show how he was prejudiced by the trial court's failure to issue the requested jury instruction. As the State points out, the

prosecutor argued in both opening and closing arguments that the defendant was guilty under a theory of criminal responsibility, conceding that the evidence indicated that Lee, rather than the defendant, was the shooter. The defendant argues that he would not have been convicted of premeditated murder had the jury been instructed that Lee was the shooter. However, a defendant need not have wielded the murder weapon to be convicted of premeditated murder under a theory of criminal responsibility. See Tenn. Code Ann. § 39-11-402 (1997); State v. Phillips, __ S.W.3d __ (Tenn. Crim. App. 2001) (finding evidence sufficient to support gang leader's conviction for first degree murder under theory of criminal responsibility, in spite of evidence he did not physically participate in killing). We conclude, therefore, that the trial court did not err by refusing to instruct the jury that Lee was the shooter. This issue is without merit.

## CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE