IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 6, 2007

## STATE OF TENNESSEE v. GEORGE FRANKLIN

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 02-08108 & 02-08109      Chris Craft, Judge**

---

**No. W2006-01204-CCA-R3-CD  - Filed October 15, 2008**

---

Following a jury trial Defendant, George Franklin, was convicted of the second degree murder of three-year-old Jessica Borner and the attempted murder of nine other people.  Defendant was convicted under the theory of criminal responsibility for the conduct of another.  It is undisputed that Defendant did not fire the shot that killed Jessica.  Defendant was sentenced to twenty-five years at one-hundred percent for second degree murder and twelve years at thirty percent for each count of attempted murder.  The trial court ordered the sentences to be served consecutively for an effective sentence of one-hundred and thirty-three years.  On appeal, Defendant challenges: (1) the sufficiency of the evidence to sustain convictions of second degree murder and nine counts of attempted second degree murder; (2) whether the trial court properly refused to grant a mistrial when the assistant district attorney general referenced the statement of a co-defendant; (3) whether the trial court properly prohibited the defense attorney from eliciting information about the alleged dangerousness of the house; (4) whether the trial court properly excluded certain prior bad acts of witnesses; (5) whether the trial court properly applied enhancement factors in sentencing; and (6) whether the trial court properly imposed consecutive sentences.  After a thorough review of the record, we affirm the judgements of the trial court except the sentencing.  Because of the improper use of enhancement factors in sentencing, we modify Defendant's sentence from twenty-five years to twenty-one years for second degree murder and from twelve years to nine years for each of the nine convictions for attempted second degree murder.  Otherwise the judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed in Part and Modified in Part**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J.C. MCLIN, JJ., joined.

Paul K. Guibao, Memphis, Tennessee, (on appeal); Gerald Skahan, Memphis, Tennessee; and Jake Erwin, Memphis, Tennessee, (at trial) and for the appellant, George Franklin.

Robert J. Cooper, Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Robert Carter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Background

The events surrounding the death of Jessica and the injury to the other victims occurred on June 12, 2002 at 3448 Rosamond in Memphis. The incident was the result of a drug transaction. That day several people were "hanging out" in the front yard of the house. Sometime in the early afternoon, Chris Burnett, who was in the yard, decided he wanted to buy a bag of marijuana. Another person present in the yard, Antonio Hawthorne, knew Defendant dealt drugs and called Defendant for Mr. Burnett. Defendant came to the home on Rosamond and sold a ten dollar bag of marijuana to Mr. Burnett sometime in the early afternoon hours. Defendant then left the premises. About ten minutes later, the group of adults in the yard determined that the marijuana was "no good," and Defendant was called to return and give Mr. Burnett his money back. Defendant came back to the house and took the marijuana and returned Mr. Burnett's ten dollars.

There was differing testimony as to what occurred when Defendant returned to give the money back. According to the State's witnesses, Defendant was angry and yelling obscenities. Ms. Helen Hobbs, who lived at 3448 Rosamond, testified that she told Tyrone Taylor who was present in the yard and Defendant to "get out of my yard with the arguing." Ms. Hobbs testified that she did not hear anymore shouting after she said this. Dennis Taylor testified that Defendant returned with "an attitude." Mr. Calvin Reed, who was also present in the yard, testified that Tyrone Taylor and Defendant got into a "big argument." Defendant testified that he was not angry that Mr. Burnett wanted his money back but that Tyrone Taylor still acted aggressively towards him. Defendant stated that Tyrone Taylor yelled at him even after he walked away. Tyrone Taylor testified that he heard Defendant say he would return to the house when he was leaving. Derek Borner, the eleven-year-old brother of Jessica, testified that he heard Tyrone Taylor, Chris Burnett, and Defendant arguing in the front yard. Mr. Borner testified that he told Ms. Hobbs about the argument and then stood behind her in the doorway. The argument continued and Mr. Borner saw Tyrone Taylor take off his shirt like "he was getting ready to fight." Defendant then said he was leaving but that he would come back.

Chris Burnett testified that Defendant was "cool" to him and was not angry when he returned to give back the money. Mr. Burnett stated that Tyrone Taylor was angry and that both men were "talking shit" to each other. Mr. Burnett testified that he did not see Defendant shoot when he came to the house the third time because he was on the ground trying to avoid the shooting. Mr. Burnett further stated that Defendant never threatened him.

Defendant testified that after he left the house, he received a "few" phone calls from Tyrone Taylor. Defendant stated that Tyrone Taylor was threatening him and that he hung up on him. Shortly thereafter, Defendant received a phone call from a friend, Rico. Rico told Defendant that Tyrone Taylor wanted to "talk" and that Defendant should go back to the house. Defendant testified that he feared what Tyrone Taylor would do to him if they ran into each other on the streets so he decided to go talk to him. As Defendant drove around the neighborhood, he noticed his cousin's car. Defendant testified that he got into the car with his cousin, Leslie Franklin, and Mack Jones and that they smoked for a short period of time. Defendant and his two friends then drove to the house

on Rosamond in Mr. Franklin's car. When they arrived, they did not park in front of the house where the drug transaction had occurred earlier because Defendant knew that house was a "hot" spot that the police watched.

According to the State's witnesses, Defendant, Leslie Franklin, and Mr. Jones got out of the car with their guns drawn. Defendant had in his possession a nine millimeter handgun and his two friends each had an assault rifle. Tyrone Taylor testified that he asked Defendant what he was going to do and that Defendant "started shooting." Tyrone Taylor stated that Defendant aimed at him and was the first of the three men to start shooting. Tyrone Taylor was shot in the arm.

Defendant admitted that he wanted his cousin and Mr. Jones to accompany him because he did not feel safe going back to Rosamond alone. Defendant stated that this was because he knew that Tyrone Taylor, Antonio Hawthorne, Calvin Reed, and Dennis Taylor were members of the gang known as the Crips. Defendant testified that after Tyrone Taylor threatened him he was scared, but he feared running into him on the street more than if he went to the house to talk to him.

Defendant testified that when he arrived at Rosamond he parked down the street and exited the car. Tyrone Taylor was walking towards him and they exchanged "what's up." Then, according to Defendant, Tyrone Taylor reached for his gun and pointed it at Defendant. Defendant stated that while he and Tyrone Taylor were greeting each other he heard the other car doors open and he assumed Mr. Jones and Leslie Franklin had exited the car. Tyrone Taylor fired a shot and Defendant said he "was ducking." After that shot was fired, Defendant testified there were "shots coming in front of me and behind me [from Mr. Jones and Leslie Franklin]." Although Defendant testified that he always carries a gun and on that day was carrying a nine millimeter, he said he never drew his gun. Despite the fact that Defendant testified that he never drew his gun, several of the state's witnesses testified that they saw that he was carrying a nine millimeter handgun. Tyrone Taylor testified that Defendant shot him in the arm. However, the crime scene investigator, Ricky Davison, testified that no nine millimeter casings were found at the scene.

Tyrone Taylor testified that Defendant, Leslie Franklin, and Mr. Jones "started shooting straight in the house." Defendant denied that he ever fired his weapon. Defendant also stated that he did not know there were children in the house. There were, however, several children in the house that day. There were three-year-old Jessica, four-year-old Lloyd Banks, Jr., ten-year-old Michael Owens, eleven-year-old Derek Borner, and teenagers Nequeshia Hobbs, Shaquesha Hobbs, and Sherry Hobbs. Lloyd was shot in the shoulder. A bullet grazed Michael's shoulder. Derek was not injured in the incident. Nequeshia was shot in the finger, Shaquesha in the leg, and Sherry was shot in the right breast.

Many of the adults testified to the chaos during the incident and damage that occurred to the house. Dennis Taylor testified that he heard more than forty shots fired in the house. Mr. Hawthorne said he heard "many shots." Sandra Hawthorne testified that she heard "a whole lot of shots" and was shot in the back. Ms. Hobbs testified she told the children to "lay down . . . someone's shooting." Ms. Hobbs was shot in her arm, chest, knee, toe, and three places on her side. Several police officers testified that the damage to the house and the crime scene in general was one of the worst they had ever seen.

J.C. Fair, who was present at the house that day, testified for the defense. Mr. Fair testified that when Defendant returned to give back the money he was calm and that Tyrone Taylor was aggressive. Mr. Fair also testified that Tyrone Taylor had a gun in his waistband on the day the incident occurred.

Dr. O'Brian Smith testified that Jessica died as a result of a high velocity gun shot wound to the chest and abdomen. He further testified that a high velocity gun is a gun like an assault rifle, while a low velocity gun is a gun like a nine-millimeter.

The jury convicted Defendant of the second degree murder of Jessica and attempted second degree murder of Chris Burnett, Tyrone Taylor, Lloyd Banks, Michael Owens, Sherry Hobbs, Nequeshia Hobbs, Sandra Hawthorne, Helen Hobbs, and Shaquesha Hobbs. After a sentencing hearing, the trial court sentenced Defendant to the maximum of twenty-five years for Jessica's death and to twelve years on each attempted murder conviction. The trial court found Defendant to be a dangerous offender and ordered that the sentences be run consecutively. This created an effective sentence of 133 years.

## II. Analysis

On appeal, Defendant challenges the sufficiency of the evidence to sustain convictions of second degree murder and nine counts of attempted second degree murder, whether the trial court properly refused to grant a mistrial when the assistant district attorney general referenced the statement of a co-defendant, whether the trial court properly prohibited the defense attorney from eliciting information about the alleged dangerousness of the house, whether the trial court properly excluded certain prior bad acts of witnesses, whether the trial court properly applied enhancement factors in sentencing, and whether the trial court properly imposed consecutive sentences.

A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1,18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this Court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).

The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. *Id.* In *State v. Grace*, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *Grace*, 493 S.W.2d at 476.

At the time of the offense, the second degree murder was defined as "the knowing killing of another." T.C.A. § 39-13-201(1) (2003). Tennessee Code Annotated section 39-11-302(b) defines "knowing" as referring "to a person who acts knowingly with respect to the conduct or circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result when the person is aware that the conduct is reasonably certain to cause the result."

Defendant was also convicted of nine counts of attempted second degree murder. Tennessee Code Annotated section 39-12-101 defines criminal attempt as:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

Defendant was convicted under the criminal responsibility statute. A person is criminally responsible for an offense committed by the conduct of another if:

(1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

T.C.A. § 39-11-402. This statute codifies the longstanding common law theories of "accessories before the fact and aiders and abettors." *Id.*, Sentencing Commission Comments. However, criminal responsibility is not itself a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Under a theory of criminal responsibility, a defendant's presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which the defendant's participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Rather, to be held criminally responsible for the acts of another, the defendant need only "'associate himself with the venture, act with knowledge that the offense is to be committed, and share in the criminal intent of the principle in the first degree.'" *Id.* (quoting *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)).

In the instant case, Defendant admitted that he wanted Mack Jones and Leslie Franklin to accompany him to the house on Rosamond. Defendant stated that this was because he thought "something could happen." Defendant also stated that if he had not returned to the house then no one would have been injured or killed that day. Defendant knew Mack Jones and Leslie Franklin were in possession of assault rifles, and he admitted he was in possession of a nine-millimeter handgun. Defendant stated that he thought there was a possibility that Tyrone Taylor would want to fight and that Defendant was willing to get it over with "right there." From the Defendant's testimony alone, there is ample evidence to support his convictions under the theory of criminal responsibility for the conduct of another person.

In addition to Defendant's testimony, Tyrone Taylor testified that he tried to talk to Defendant and Defendant responded that he did not want to talk. Tyrone Taylor testified that Defendant was the first to shoot his gun. Dennis Taylor testified to similar happenings that day. Dennis Taylor stated that Tyrone Taylor tried to talk to Defendant but that Defendant would not talk to him and "just started shooting." Because a reasonable trier of fact could have found Defendant guilty of one count of second degree murder under the theory of criminal responsibility and nine counts of attempted second degree murder, Defendant is not entitled to relief as to this issue.

B. The Denial of the Motion for Mistrial

Defendant contends that the trial court erred when it refused to grant a mistrial after the assistant district attorney referenced a comment made by Defendant's co-defendants during his cross-examination of Defendant. The co-defendants were not available to testify. The statement at issue occurred as follows:

| | |
|---|---|
| [ASSISTANT DISTRICT ATTORNEY]: | But y'all had to go to another location to get the weapon. |
| [DEFENDANT]: | No sir. |
| [ASSISTANT DISTRICT ATTORNEY]: | You know that's what they [co-defendants] said. |
| [DEFENSE COUNSEL]: | Objection. |
| . . . | |
| [DEFENSE COUNSEL]: | If we could approach, Judge? |
| [THE COURT]: | Yes. |
| . . . | |
| [DEFENSE COUNSEL]: | Judge, if I understand him, he's talking about what Leslie and Mack said? |
| [ASSISTANT DISTRICT ATTORNEY]: | Right. |
| [DEFENSE COUNSEL]: | They're not going to be able to be cross-examined. |
| [ASSISTANT DISTRICT ATTORNEY]: | It's not being offered for the truth of the matter. |
| [DEFENSE COUNSEL]: | But he's talking about comments and statements that co-defendants made and asking questions about that. Judge, I think that's highly improper. |
| THE COURT: | I don't think you should do that, [Assistant District Attorney], because unless you are going to put them on and call them as witnesses, you can't - I mean, that's what |

-7-

|  |  |
|---|---|
|  | *Bruton* is all about, you know, not allowing statements in. |
|  | . . . |
| THE COURT: | I'm going to give a curative instruction. |
| [DEFENSE COUNSEL]: | Ok, thank you. |
| THE COURT: | Ladies and Gentlemen, attorneys [sic] statements aren't evidence. What other people said or didn't say or what people suggest they might have said are not evidence at all unless they are here, called as a witness by either side, and they can be cross-examined, so I'm going to ask you just to strike that question from your minds because it's just not - at this point, people could ask, "Well isn't it true that President Bush said you did this and that," and it's just not evidence, so I'm going to ask you to strike it." |

The determination of whether to grant a mistrial rests within the sound discretion of the trial court. *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. *State v. Brown*, 53 S.W.3d 264, 284 (Tenn. Crim. App. 2000). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). No abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into account. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993).

Defendant's counsel properly objected, and the trial court issued a curative instruction; therefore, we must determine if the trial court abused its discretion by not granting a mistrial. In the instant case, the reference made by the assistant district attorney regarding the statement made by the co-defendants was brief and vague. After the objection the trial court informed the jury that statements or questions asked by attorneys are not evidence and should not be considered by them in determining their verdict. This instruction was repeated in the oral and written jury charge as well. Therefore, we conclude that the curative instruction was sufficient to clarify to the jury what they could consider in determining Defendant's guilt or innocence. Accordingly, the trial court did not abuse its discretion, and Defendant is not entitled to relief as to this issue.

C. The Exclusion of Evidence of the Alleged Dangerousness of the House

Defendant contends that the trial court erred in refusing to allow him to introduce evidence of the alleged dangerousness of the house in order to explain why Defendant went back to the home armed and with two armed friends. In the jury-out offer of proof as to this issue, Defendant cross-

examined Geraldine Borner, Jessica Borner's mother. Defense counsel asked Ms. Borner, who lived at 3448 Rosamond, if she was aware of several instances involving violence at the residence. Ms. Borner responded that she was unaware of any of the violent instances asked about by defense counsel. This cross-examination was the only evidence presented in the offer of proof by the defense. Because Ms. Borner denied any knowledge of the alleged dangerousness of the house and because no other evidence was presented as to the relevancy of the issue, the trial court did not err when it refused to allow Defendant to introduce evidence or cross-examine witnesses on this issue.

### D. The Exclusion of Certain Prior Bad Acts of Witnesses

Defendant contends that the trial court erred in refusing to allow the defense to elicit information about prior bad acts of witnesses other than Tyrone Taylor. The court also held a jury-out hearing to determine what prior bad acts, if any, could be inquired into by the defense. The trial court determined that only the prior bad acts of Tyrone Taylor could be brought out by the defense. The trial court determined that the jury could find that Tyrone Taylor was the first aggressor. Defendant testified that his co-defendants began shooting after Tyrone Taylor pulled a gun on them. The court determined that "they would have a right to put on proof of Tyrone Taylor's aggressiveness, but not anyone else's aggressiveness or fights in the neighborhood . . ."

The rulings on admissibility of evidence are largely within the sound discretion of the trial court and will not be disturbed on review absent abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Abuse of discretion is found when "it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). In the instant case, the court held a jury-out hearing and determined that only the prior bad acts of Tyrone Taylor could be admitted. Defense counsel objected to the exclusion of the other witnesses' prior bad acts, but the trial court determined that evidence of prior bad acts of the others present in the yard was irrelevant. Specific violent acts of the victim are admissible to corroborate Defendant's assertion that the victim (Tyrone Taylor) was the first aggressor. *State v. Furlough*, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990). However, those acts are not admissible to prove the victim (or witnesses) acted in accordance with a character trait. *Furlough*, 797 S.W.2d at 649. While the trial court properly allowed the defense to present evidence of Tyrone Taylor's prior bad acts because, under the defense's theory, he was the first aggressor, the other witnesses' or victims' prior bad acts were not admissible under *Furlough* or Tennessee Rules of Evidence Rule 404(b). Accordingly, Defendant is not entitled to relief as to this issue.

### E. Sentencing Issues

We note that the legislature has recently amended several provisions of the Sentencing Reform Act of 1989, which became effective June 7, 2005. However, although Defendant was sentenced after the effective date of the amended Act, Defendant's crimes in this case occurred prior to June 7, 2005, and Defendant did not elect to be sentenced under the provisions of the amended Act by executing a waiver of his ex post facto protections. *See* 2005 Tenn. Pub. Acts ch. 353 § 18.

Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crimes were committed.

Defendant was sentenced to twenty-five years for his second degree murder conviction and twelve years for each of the nine convictions of attempted second degree murder all to be served consecutively for a total effective sentence of 133 years. A person convicted of second degree murder, a Class A felony, faces fifteen to twenty-five years in prison. The statutory presumptive sentence was twenty years. T.C.A. §§ 39-13-210(c), -40-35-112(a)(1). A person convicted of attempted second degree murder, a Class B felony, faces eight to twelve years in prison. The statutory presumptive sentence was eight years. T.C.A. §§ 39-12-107(a), -39-13-210(c), -40-35-112(a)(2).

When a defendant challenges the length or the manner of service of his or her sentence, this Court must conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). This presumption, however, is contingent upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999).

In making its sentencing determinations the trial court had to consider: (1) the evidence presented at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; (6) the defendant's potential or lack of potential for rehabilitation or treatment; and (7) any statements made by Defendant in his own behalf. T.C.A. §§ 40-35-103 and -210; *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App.1995). The defendant bears the burden of showing that his sentence is improper. T.C.A. § 40-35-401(d), Sentencing Commission Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

1. Enhancement Factors

The sentencing hearing in this case was held on March 14, 2006. In April 2005, our supreme court concluded that the pre-2005 Sentencing Reform Act did not violate *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). *State v. Gomez*, 163 S.W.3d 632, 661 (Tenn. 2005) (*Gomez I*). In *Blakely*, the United States Supreme Court concluded that the "'statutory maximum' for [sentencing] purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 124 S.Ct. at 2536; (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000)). In *Blakely*, the Court held that "'o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id*. The United States Supreme Court subsequently vacated our supreme court's ruling in *Gomez I* and remanded the case to the supreme court for additional consideration in light of the Court's opinion in *Cunningham v. California*, 549 U.S. ___, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007). In *Cunningham*, the Supreme Court held "[b]ecause circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance

-10-

of the evidence, not beyond a reasonable doubt . . . the DSL violates *Apprendi's* bright-line rule: Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Cunningham*, 549 U.S. at ___, 127 S.Ct. 856. (citing *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2348).

Upon reconsideration, our supreme court in *Gomez II* concluded that other than a defendant's previous history of criminal convictions or other facts admitted to by the defendant, the application of enhancement factors which increases the defendant's sentence over the statutorily presumptive sentence deprives the defendant of his or her Sixth Amendment right to have a jury determine whether those enhancement factors applied. *State v. Gomez*, 239 S.W.3d 733, 739-40 (Tenn. 2007) (*Gomez II* ) (citing *Cunningham*, 127 S. Ct. at 860).

Although Defendant challenged the length of his sentence on appeal, Defendant did not base his claim on Sixth Amendment principles but rather on the misapplication of enhancement factors. Defendant does have a prior criminal record consisting of three misdemeanor convictions. The trial court during the sentencing hearing stated that it found, as an enhancement factor for all the convictions, the fact that Defendant did have a prior criminal record, but did not "give a good deal of weight to it" because the convictions were misdemeanors. The court went on to find three more enhancement factors. *See* T.C.A. 40-35-114(3), (5), (10). The court stated that it gave a "good deal of weight" to factor (2), that Defendant was the leader in the commission of the offense. The court also found that Jessica was particularly vulnerable because of her age and that Defendant possessed a firearm during the offense. The court found no mitigating factors. When sentencing Defendant for the nine attempted second degree murders, the court found five enhancement factors. *See* T.C.A. 40-35-114 (2), (3), (10), (11), (17). The court stated that it sentenced Defendant to twelve years on each attempted second degree murder conviction because "there are just a whole lot of enhancement factors."

In *Gomez II*, our supreme court reviewed the defendants' sentencing claims under plain error analysis. *Gomez*, 239 S.W.3d at 737. Rule 52 of the Tennessee Rules of Criminal Procedure provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in a motion for new trial or assigned as error on appeal." Relief is granted under plain error review "only where five prerequisites are met: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id*. (quoting *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

In the case *sub judice*, the record clearly establishes what occurred in the trial court in determining the length of Defendant's sentences, and thus the first prerequisite is met. In *Gomez II*, our supreme court concluded that "the trial court's application of the two other enhancement factors [not based on the defendants' prior convictions] breached a clear and unequivocal rule of law" in light of *Cunningham*. *Gomez II*, 239 S.W.3d at 740-41. Further, the trial court's determination that enhancement factors (3), (5), (10), (11), and (17) were applicable to increase Defendant's sentences deprived him of the Sixth Amendment right to have a jury determine whether those enhancement

factors applied and, thus, a substantial right of the accused was adversely affected. *See id*. At the time of Defendant's sentencing hearing, *Gomez I*, which concluded that Tennessee's sentencing structure did not violate Sixth Amendment principles, was controlling precedent. Therefore, it cannot be said that Defendant waived his Sixth Amendment claim for tactical reasons. *See id*. Finally, although Defendant has a criminal record, the trial court admittedly did not give that much weight and enhanced his sentence because of the many other enhancements factors found. In light of *Gomez II*, we conclude that granting Defendant relief is necessary to do substantial justice in this case. Accordingly, we reduce Defendant's sentence to twenty-one years for the second degree murder conviction and to nine years for each of the nine convictions for attempted second degree murder.

### 2. Consecutive Sentencing

This Court has consistently held that *Blakely* does not impact consecutive sentencing. See *State v. William Shane Bright*, No. E2006-01906-CCA-R3-CD, 2007 WL 1259176, at *3 n.1 (Tenn. Crim. App., at Knoxville, April 30, 2007) *perm. app. denied* (Tenn. July 6, 2007); *State v. Earice Roberts*, No. W2003-02668-CCA-R3-CD, 2004 WL 2715316 at *14-15 (Tenn. Crim. App., at Jackson, Nov. 23, 2004) *perm. app. denied* (Tenn. April 6, 2005); *State v. Lawrence Warren Pierce*, No. M2003-01924-CCA-R3-CD, 2004 WL 2533794 at *16 (Tenn.Crim.App., Nashville, Nov. 9, 2004) *perm. app. denied* (Tenn. March 15, 2005).

Under Tennessee Code Annotated section 40-35-115(b)(4), a court may impose consecutive sentences when the defendant is convicted of more than one offense and when the trial court finds by a preponderance of the evidence that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." "Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). Once a court has determined that a defendant is a dangerous offender, it must also determine that an "extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939.

In the instant case, the trial court properly determined that Defendant was a dangerous offender. The court stated, "[a]nyone [sic] who would get two armed men with automatic rifles and descend upon a person's house, after having already left, and then come back, [with] fully loaded weapons . . . has no regard for human life and no hesitation about committing a crime in which the risk to human life is high." The court then found that extended confinement was necessary to protect the public from Defendant's "unwillingness to lead a productive life, and his resort to criminal activity in furtherance of an anti-social lifestyle." Lastly, the court concluded that "with the devastation that he wrought on this community and these people, I find that that reasonably relates to these offenses." Because the trial court properly determined that Defendant was a dangerous offender and applied consecutive sentencing, Defendant is not entitled to relief as to this issue.

**CONCLUSION**

For the foregoing reasons, the judgments of the trial court are affirmed except in regard to sentencing. In regard to the issue of sentencing we modify Defendant's sentence to twenty-one years for the conviction of second degree murder and to nine years for each conviction of attempted second degree murder, to be served consecutively for a total effective sentence of 102 years.

_____

THOMAS T. WOODALL, JUDGE