IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2005

## STATE OF TENNESSEE v. BRANDON McCASLIN

Direct Appeal from the Circuit Court for Dyer County
No. C04-55A     Lee Moore, Judge

No. W2004-02539-CCA-R3-CD - Filed September 6, 2005

This is a direct appeal as of right from a jury verdict of guilty of two counts of theft of property over $1,000, both Class D felonies.   The Defendant was sentenced to four years of confinement as a Range II, multiple offender.  On appeal, the Defendant argues only one issue: there is insufficient evidence to find him guilty beyond a reasonable doubt of the offenses for which he was convicted. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Noel H. Riley, Dyersburg, Tennessee, for the appellant, Brandon McCaslin.

Paul G. Summers, Attorney General & Reporter; Seth Kestner, Assistant Attorney General; and C. Phillip  Bivens, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Defendant's two theft convictions stem from incidents occurring on January 9, 2004, during which the Defendant, Brandon McCaslin, and his co-defendant stole forty-seven rings from two different jewelry stores in Dyersburg.  The Defendant and his cohort were captured the day of their crimes, due in part to the fact that the local police recognized the two on a surveillance video obtained from one of the jewelry stores, which also recorded the theft on tape.  The Defendant and his companion were indicted by a Dyer County grand jury in February of 2004 on one count of theft of property over $1,000, a Class D felony, and one count of theft of property over $10,000, a Class C felony.   Although his co-defendant entered guilty pleas to the charges, the Defendant elected to go to trial.  The Defendant's jury trial was held in July of 2004.

The evidence presented at trial showed that the Defendant drove himself and Mr. Doss, his co-defendant, to Jones Jewelry and then to the Diamond Gallery in Dyersburg. At both stores, Mr. Doss removed entire trays of rings while the Defendant spoke with the store attendants. The Defendant then drove himself, Mr. Doss, and a mutual acquaintance to several pawn shops, where three of the stolen rings were sold. The sale of the stolen property came to an end when the owner of the fourth pawn shop visited became suspicious and called the police. Based on descriptions from the clerks at the two jewelry stores and the pawn shop owner, along with the surveillance tape footage, Dyersburg Police Officers began looking for the Defendant and his co-defendant. Shortly thereafter the Defendant's vehicle was discovered near his mother's house, and arrest warrants were obtained for the two men. The Dyersburg Police gained entry to the house, wherein they found the Defendant and Mr. Doss hiding. The two were taken into custody and separately interviewed at the police station. The Defendant informed the police that the remainder of the rings were hidden in his mother's house.

At trial, Tammy Kimbrell testified that she was working at Jones Jewelry the day twelve rings were stolen. She stated that two men came into the store and "one kept me busy" by claiming to be looking for a gift for his girlfriend. Shortly after the two men left the store together, another mall patron informed Ms. Kimbrell that she saw someone reach into one of the jewelry cases. Ms. Kimbrell checked her displays and discovered that a tray containing twelve rings was missing. She immediately called the police and filed a report. Ms. Kimbrell gave physical descriptions of the two men to the police the day of the crime, but at trial she could not positively identify the Defendant as one of those men. Greg Swims, one of the owners of Jones Jewelry, testified that the value of the stolen rings was over $1,000. He also stated that eleven of the twelve rings had been recovered and returned to him.

Rick Wilbanks, the owner of the Diamond Gallery, testified that when the Defendant and Mr. Doss visited his store he was assisting another customer. He eventually spoke with the Defendant, showing him various items, but the two men left without making a purchase. While putting away his merchandise at the end of the day, Mr. Wilbanks discovered that three trays, containing a total of thirty-five rings, were missing. Mr. Wilbanks stated that the retail value of the rings was $17,881.[1] Immediately after discovering the missing rings, Mr. Wilbanks reviewed his surveillance tape from the day, which showed Mr. Doss reach into the jewelry case and take the trays of rings out to the Defendant's Jeep in two separate trips. Mr. Wilbanks called the police, filed a report, and turned the surveillance tape over to investigators with the Dyersburg Police Department.[2]

The owner of City Pawn Shop in Dyersburg, Bennie Patterson, testified that he received a call from the Dyersburg Police Department regarding the theft of jewelry on the day of the thefts. Mr. Patterson stated that only "a few minutes later" a women he knew to be Crystal Custer entered

---

[1]Mr. Wilbanks testified that the $17,881 figure was the amount of money he would have made if he had sold all the stolen rings for their full retail price.

[2]Although the store video surveillance tape is not contained in the record on appeal, the trial transcript reflects that the video was introduced as evidence and was viewed by the jury.

his shop desiring to sell a couple of rings. Because the rings were new, Mr. Patterson became suspicious. He called the police and began to describe the rings over the phone. Mr. Patterson testified that as he was talking to the police, Ms. Custer left the rings, exited the store, and drove off in a white Jeep driven by the Defendant, whom Mr. Patterson knew.

Officer Chris Hamm with the Criminal Investigation Division of the Dyersburg Police Department testified that he responded to the report of a theft at Jones Jewelry, and interviewed Ms. Kimbrell. After learning of the theft, he called several local pawn shops, including the City Pawn Shop, and warned the proprietors to be on the look-out for stolen rings. Shortly thereafter, Officer Hamm received Mr. Patterson's call regarding the suspicious rings. He interviewed Mr. Patterson, took possession of the two rings and transported them to Jones Jewelry for identification. However, the rings did not match those stolen from Jones Jewelry.

Officer Jim Joyner testified that he was called to respond to a report of theft from the Diamond Gallery on January 9, 2004. Officer Joyner was aware that Officer Hamm was investigating the earlier Jones Jewelry theft and had recovered rings from a pawn shop that had not been matched to that theft. Officer Joyner called Officer Hamm and asked him bring the rings to the Diamond Gallery. Mr. Wilbanks of the Diamond Gallery identified the rings recovered at the City Pawn Shop as belonging to his store.

Officer Hamm testified at trial that he identified the Defendant and Mr. Doss from the Diamond Gallery surveillance video, and immediately began looking for the two suspects. The Defendant's white Jeep was discovered parked in a hospital parking lot very near his mother's house. The police watched the Jeep and the house for several hours, hoping to find the two suspects. At one point, two individuals were seen looking out of the windows of the house. The police went and knocked on the door, but no one answered.

Officer Joyner testified that the Defendant's mother was called, and she eventually came and authorized the police to enter her home after arrest warrants for her son and Mr. Doss were presented. The police entered the house and discovered the Defendant hiding under a mattress, and Mr. Doss hiding in a shower. Both men were taken into custody, and were interviewed separately at the police station. Officer Hamm testified that the Defendant admitted he was with Mr. Doss when the rings were stolen, but maintained that he himself had nothing to do with taking the rings. The Defendant also informed the police that the remainder of the rings were hidden under the sink in the bathroom of his mother's house.

Ms. Crystal Custer testified that she knew Mr. Doss, and was a friend of the Defendant. She stated that on the date in question, Mr. Doss contacted her and asked her to help him pawn some rings because he did not have any state issued I.D. The Defendant and Mr. Doss picked her up and proceeded to drive to Missouri in the Defendant's Jeep, where she sold two rings at two different pawn shops, each time giving the money to Mr. Doss. The group then returned to Dyersburg, where Ms. Custer pawned one more ring at a local pawn shop before going to the City Pawn Shop. Ms. Custer testified that when the attendant at the City Pawn Shop became suspicious and placed a call

to whom she believed was the police, she left the store, went back to the Jeep and asked the Defendant and Mr. Doss if the rings were stolen. They confirmed that they were, but stated that they were stolen from a woman in Jackson. Ms. Custer then demanded that the Defendant drive her home, which he did.

Ms. Custer further testified that when the Defendant dropped her off at her house, he gave her four or five rings, and asked her to hold on to them for him, which she did. The next day, a Saturday, Ms. Custer was informed that the Defendant and Mr. Doss had been arrested for stealing rings from two local jewelry stores. Ms. Custer became very concerned and called the police, who came to her house and took the rings she was holding for the Defendant. The following Monday she went to the police station and gave a statement to investigators working on the case.

Ms. Custer also stated that after she had given the rings to the police, the Defendant, out on bail, came to visit her and asked for the rings. She told him she gave the rings to a friend for safe keeping. Ms. Custer further testified that the Defendant then told her that he "distracted" the store clerks while Mr. Doss took the rings, and the police did not have anything on him. He explained that because Mr. Doss already knew he was going to jail for violating his parole, he was going to take the full blame for the thefts.

On cross-examination, Ms. Custer admitted that she was originally charged, along with the Defendant and Mr. Doss, for her involvement in the incident, but made a deal to have her charges dropped if she would testify at the Defendant's trial. Ms. Custer also testified that she was currently on probation herself for a prior theft conviction.

The defense called one witness at trial, Jeremy Doss. Mr. Doss testified that he was currently serving a sentence with the Tennessee Department of Correction for parole violations and theft convictions related to the same incident for which the Defendant was being tried. According to Mr. Doss, he and the Defendant first visited several shops at the Dyersburg mall, including Jones Jewelry. The Defendant was shopping for a gift for his girlfriend. Mr. Doss stated that when he noticed one of the jewelry cases was open, he just took a tray of rings and carried it out to the Defendant's Jeep. After the two left Jones Jewelry, they drove to a pet store to look at puppies and feed the fish. After visiting the pet store, Mr. Doss stated they walked next door to the Diamond Gallery, where the Defendant continued shopping for a gift. When the store attendant walked to a back room, Mr. Doss took advantage of the opportunity to steal three trays of rings, again taking them out to the Defendant's Jeep while the Defendant continued to shop for a gift.

Mr. Doss testified that he did not inform the Defendant about the rings stolen from either store until after the two were driving away from the Diamond Gallery. The two then went to the Defendant's mothers' house, where Mr. Doss hid most of the rings under the sink. The Defendant and Mr. Doss then picked up Ms. Custer and started pawning some of the rings. After two rings were left at the City Pawn Shop, the group picked up some drugs and then dropped Ms. Custer off at her house, where Mr. Doss claimed he gave Ms. Custer several rings as payment for her help in pawning the others. The two men then returned to the Defendant's mother's house where they drank

alcohol, smoked marijuana and used cocaine until the police found and arrested them. Mr. Doss also stated that he never at any time gave any rings, or money obtained from selling the rings, to the Defendant. According to Mr. Doss, the only benefit the Defendant received from either theft was "maybe" some drugs purchased with money obtained from pawning a few of the rings.

On cross-examination, Mr. Doss could not explain why the surveillance video showed the two drive directly up to the front of the Diamond Gallery in the Defendant's Jeep and enter the store, considering he testified that they had walked to the Diamond Gallery from a nearby pet store. Mr. Doss also admitted that the two had been involved together in a prior criminal incident in 2000, where he had been convicted of theft of a car and the Defendant was convicted for joyriding. The Defendant elected not to testify. At the conclusion of the trial, the Defendant was found guilty of theft of property over $1,000, a Class D felony, in both counts one and two. This appeal followed.

## ANALYSIS

In the Defendant's sole issue on appeal, he asserts that there is insufficient evidence for any rational trier of fact to find beyond a reasonable doubt that he was guilty of the two crimes of theft for which he was convicted. In support of this assertion, the Defendant argues that he never obtained or exercised control over the stolen rings at any point between the time when Mr. Doss took them from the display cases and the time when they were recovered by the police.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The Defendant was convicted of two counts of theft of property over $1,000. A person commits theft of property if that person: 1) "knowingly obtains or exercises control over the property," 2) "with intent to deprive the owner" of the property, and 3) "without the owner's effective consent." Tenn. Code Ann. § 39-14-103. In addition to these three elements, the fact finder must also determine the classification of the theft, based on the value of the property stolen. A theft of property valued at $1,000 or more but less than $10,000 is a Class D felony. See Tenn. Code Ann. § 39-14-105(3).

The Defendant argues that his convictions cannot stand because none of the State's witnesses could testify that he obtained the stolen rings; it was Mr. Doss, he asserts, who physically took the rings from the jewelry store display cases. He further argues that he never exercised control over the stolen rings or any of the money obtained from selling the rings. To support this argument he points primarily to the testimony of Mr. Doss. The Defendant's arguments are unpersuasive. The proof supports the Defendant's convictions for theft of property, both by his exercising control over stolen property, and under the theory of criminal responsibility for conduct of another.

## I. Theft by Exercising Control

It is undisputed that the Defendant did not "obtain" the stolen rings by personally removing them from the jewelry cases. Rather, the State presented evidence that the Defendant knowingly "exercis[ed] control over" the stolen property without the owner's consent and with the intent to deprive the owner of that property. See Tenn Code Ann. § 38-14-103.

Following the 1989 legislative changes to Tennessee's theft offenses, either obtaining or exercising control over stolen property will support a conviction for theft. Our supreme court has succinctly summarized the effect of this change by noting that "theft of property may be accomplished in one of two manners: (1) taking or obtaining property without consent and with intent to deprive; or (2) exercising control over property without consent and with the intent to deprive." State v. Byrd, 968 S.W.2d 290, 292 (Tenn. 1998). It is the latter manner of theft that is implicated in this case.

The Tennessee Supreme Court has further held that simply having "access" to stolen property can be synonymous with exercising control over it under certain circumstances. See Byrd, 968 S.W.2d at 292 (holding that a defendant had "simultaneous access to or control over the property without consent" when she was riding in a car containing stolen items along with three other individuals).

In this case, both the direct evidence and circumstantial evidence submitted at trial supports a finding that the Defendant did exercise control over the stolen rings. Ms. Custer testified that the Defendant gave her several rings after dropping her off at her house, and later, after being arrested for theft, came back to her house to collect the rings. While Mr. Doss contradicted this testimony by claiming it was he who gave the rings to Ms. Custer as "payment" for her aid in pawning the other rings, it is within the province of the jury to accredit or discredit the testimony of witnesses as it deems prudent. As stated above, questions about the credibility of witnesses and the weight and

value of their testimony are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236.

Additionally, this Court has previously ruled that "[t]he proscription in the theft statute of 'exercis[ing] control' over the property strikes us as the functional equivalent of 'constructive possession,' thereby allowing ownership or . . . control of the vehicle to assume particular significance." State v. Tommy William Davis, No. E2002-00511-CCA-R3-CD, 2003 WL 649113, at *4 (Tenn. Crim. App., Knoxville, Feb. 28, 2003) (relying, in part, on cases affirming illegal drug convictions based on "constructive possession" to support a conviction for theft of property where the defendant was operating the vehicle in which the stolen property was recovered). In the case at hand, the record reflects that both prosecution and defense witnesses testified that the Defendant knew of the theft of the rings no later than after his departure from the Diamond Gallery.[3] Nonetheless, the Defendant transported the stolen property to four separate pawn shops in two different states in an attempt to sell the rings.

In the absence of direct evidence, criminal intent must often be inferred from the surrounding circumstances. See State v. Holland, 860 S.W.2d 53, 59, (Tenn. Crim. App. 1993). It has been noted that "[t]his is particularly true in theft offenses where the prosecution is initiated upon a theory of exercising control over stolen property." State v. Richard Crawford, No. W2000-00335-CCA-R3-CD, 2001 WL 278091, at *3 (Tenn. Crim. App., Jackson, Mar. 14, 2001). While the Defendant in this case claims he never exercised control over the stolen property and therefore Mr. Doss should be solely accountable for the thefts, his own actions suggest that he recognized his role in the theft crimes. The fact that the Defendant hid under a mattress when the police entered the house is a circumstance from which a jury could legitimately infer guilt. See Sotka v. State, 503 S.W.2d 212, 221 (Tenn. Crim. App. 1972) (holding that a defendant's attempts to evade arrest are relevant as "circumstances from which, when considered with all the other facts and circumstances in evidence, the jury could properly draw an inference of guilt"). Additionally, a jury could legitimately infer the Defendant's guilt based on the fact that the stolen rings were recovered from the Defendant's mother's house, where the Defendant also resided. See State v. Hatchett, 560 S.W.2d 627, 629 (Tenn. 1987) (holding that "[p]ossession of recently stolen property, if not satisfactorily explained, is a circumstance from which the trier of fact may draw an inference and find that the person in possession knew the property had been stolen.").

In short, both the direct and circumstantial evidence presented at trial was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the Defendant exercised control over the stolen rings without consent and with the intent to deprive the owner of the property.

## II. Criminal Responsibility For the Conduct of Another

Tennessee statutes dictate that a person is "criminally responsible for an offense committed by the conduct of another if: Acting with intent to promote or assist the commission of the offense,

---

[3]Ms. Custer testified that the Defendant knew the rings were stolen before this point, stating he informed her that he actively participated in both thefts by distracting the clerks.

or to the benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). This statute codifies the longstanding common law theories of "accessories before the fact and aiders and abettors." Id., Sentencing Commission Comments. However, criminal responsibility is not itself a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense. . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Under a theory of criminal responsibility, a defendant's presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which that defendant's participation in the crime may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act must be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. See State v. Caldwell, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Rather, to be held criminally responsible for the acts of another, the defendant need only "'associate himself with the venture, act with knowledge that the offense is to be committed, and share in the criminal intent of the principal in the first degree.'" Id. (quoting State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)).

In this case, the record reveals that the Defendant drove the principal, Mr. Doss, to both of the jewelry stores from which the rings were stolen, continued to drive Mr. Doss and the stolen rings to multiple pawn shops in an effort to sell the stolen rings, and was eventually caught by the police hiding in his mother's house along with Mr. Doss. Additionally, the evidence submitted at trial reflects that the Defendant told Ms. Graves that he aided Mr. Doss by distracting the store clerks while the rings were removed from the display cases. We have no hesitation in concluding that the Defendant's continual association with the principal, and his direct aid in the criminal venture itself, has rendered him criminally responsible for the theft offenses.

Having carefully reviewed the record, we conclude that the evidence is sufficient to support the jury's verdicts of guilt beyond a reasonable doubt. Viewed in the light most favorable to the State, we conclude the evidence presented at trial established that the Defendant was guilty of the crime of theft both by exercising control over the stolen property, and through a theory of criminal responsibility for the conduct of another. Accordingly, we find the Defendant has failed to meet his burden of demonstrating that there was insufficient evidence presented at trial for any rational trier of fact to conclude beyond a reasonable doubt that he was guilty of theft. Thus, this issue has no merit.

**CONCLUSION**

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE