# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 7, 2011

## STATE OF TENNESSEE v. MARLON McKAY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-07886      James M. Lammey, Jr., Judge**

**No. W2010-01785-CCA-MR3-CD  - Filed November 4, 2011**

The defendant, Marlon McKay, was convicted by a Shelby County Criminal Court jury of first degree felony murder and attempted aggravated robbery and was sentenced by the trial court to consecutive terms of life plus six years in the Department of Correction. On appeal, he challenges the sufficiency of the convicting evidence and contends that the trial court committed plain error by granting the State's request to omit a portion of the pattern jury instruction on criminal responsibility. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Tiffani S. Taylor, Memphis, Tennessee, for the appellant, Marlon McKay.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; General; William L. Gibbons, District Attorney General; and Stacy M. McEndree and Kevin R. Rardin, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the August 19, 2008 shooting death of Maurice Taylor, which occurred outside his Memphis home during the course of an attempted robbery. On December 11, 2008, the Shelby County Grand Jury returned a two-count indictment charging the defendant and Courtney Bishop with the felony murder and attempted aggravated robbery of the victim. The court subsequently granted the defendant's motion to sever his case from

Bishop's, and the defendant proceeded to trial alone before a Shelby County jury on May 17, 2010.

## State's Proof

The victim's mother, Robin Taylor, testified that at the time of his death the victim was twenty-four years old and had been sharing a home on Cella Street with his older brother, Mareo Taylor.

Calvin McKissack, a resident of Cella Street, testified that he was outside his home on the evening of August 19, 2008, watching a friend repair a lawnmower when he became aware of a Mercury Cougar automobile that kept stopping under the streetlight in front of the house across the street, pulling off again, and then returning four or five minutes later to stop in the same spot. The windows were tinted but cracked open, and he was able to see two African-American men inside who kept looking back over their shoulders each time they pulled in front of the house. After having seen the men circle the block in the same fashion four or five different times, McKissack and his friend decided to go inside. Approximately five minutes later, McKissack heard gunshots, went back outside, and learned that the victim, who lived several doors down, had been shot in his yard.

Brooke Howard, who also resided on Cella Street at the time of the shooting, testified that she was returning home from work at about10:30 p.m. on August 19, 2008, when her suspicions were aroused by the sight of an unfamiliar white car that traveled slowly down the street two or three different times. About twenty or thirty minutes later, she was in her bedroom when she heard gunshots.

The victim's brother, Mareo Taylor, testified that he and the victim were sharing a home on Cella at the time of the shooting and that the victim, who had only a part-time job, sold marijuana to supplement his income. Several hours before the shooting occurred, he asked the victim to give him $10, but the victim told him he had to buy some marijuana first. At about 8:30 or 9:00 p.m. that night, the defendant stopped by the home to see the victim, stayed a few minutes, and then left. As the defendant walked through the kitchen, Taylor saw that he was carrying a large plastic bag, but he was unable to see its contents.

Approximately two hours later, Taylor was watching television with his girlfriend when the victim received a telephone call and then walked out the kitchen door to the driveway. Almost immediately after the victim shut and locked the door behind him, Taylor heard the victim say his name followed by the sound of a gunshot. He looked out the window, saw the victim staggering beside the kitchen door, and tried to reach him by exiting the kitchen door. He did not have his door key on him, however, so he then ran out the living

room door and around the house to the kitchen door. By the time he reached the victim approximately thirty to forty-five seconds later, the victim was lying on the ground gasping for air. Taylor testified that the victim was not armed and that there were no weapons in the home.

Marvin Riley, who was living with a friend on Cella at the time of the shooting, testified that he heard a single gunshot at about 11:00 p.m. on August 19, 2008, looked out the front door of his friend's home, and saw what appeared to be the victim lying on the ground and two African-American men running side by side down the sidewalk to a light-colored car parked on the street. He said that the men got into the vehicle and drove off, turning right onto Hamilton Street toward Lamar Avenue.

Antonio Archie testified that sometime between 10:00 and 11:00 p.m. on August 19, 2008, he had just started his turn off Hamilton Street en route to his home on Cella when a light-colored, two-door car with two African-American men inside pulled off rapidly from where it had been stopped on Cella, accelerated down the street, and turned onto Hamilton headed toward Lamar. When Archie arrived home, he heard a commotion and saw the victim's brother's girlfriend calling 9-1-1 while the victim's brother held the victim in his arms.

The defendant's former live-in girlfriend, Tracy Taylor, testified that the defendant borrowed her 1997 silver Mercury Cougar at about 8:45 p.m. on August 19, 2008. The defendant also used her cell phone that night. The witness identified a photograph of a revolver that she said she had seen around her home during the time that the defendant lived with her. On cross-examination, she testified that during the time the defendant lived with her, he smoked marijuana and occasionally took Xanax bars mixed with a prescription cough syrup containing Promethazine, otherwise known by its street name of "syrup." She said that the defendant smoked marijuana with her on August 19, 2008, before he borrowed her car. She conceded it was possible that the defendant also used Xanax and Promethazine that day.

Officer Lesley Jones of the Memphis Police Department, who responded to the reported shooting at approximately 11:20 p.m., testified that he and several fellow police officers attempted CPR on the victim for approximately seven to nine minutes until fire department officers arrived and pronounced him dead.

Walter Spencer, another resident of Cella Street, testified that on the night of August 19, 2008, he heard a gunshot followed by the sound of car doors shutting and a vehicle "speeding off." When he looked out the window, he saw a light-colored car turning right at the stop sign onto Hamilton.

Susan Acerra, an investigator with the Shelby County Medical Examiner's Office, testified that when she responded to the scene of the shooting, she found the victim lying on his back on the ground with a gunshot wound in his chest. Her inventory of his person uncovered $1,163.75 in cash, a cell phone, a tube of chapstick, and a butane lighter.

Cell phone records of the defendant's ex-girlfriend, Tracy Taylor, were introduced as an exhibit by stipulation of the parties.

Officer David Payment of the Memphis Police Department's Crime Scene Investigation Unit identified various photographs he took of the crime scene, including ones that showed an empty clear plastic bag that was found beside the victim's foot and another clear plastic bag containing .41 grams of marijuana, which was found on the ground beside the victim's shoulder. He said he found no weapons or bullet casings at the scene.

Detective Samuel McMinn of the Memphis Police Department's Investigative Support Unit testified that, as part of his investigation, he transported Tracy Taylor and the defendant to the Homicide Office on August 20, 2008.

Sergeant James Max of the Memphis Police Department's Homicide Unit testified that he interviewed the defendant in two separate sessions on August 22, 2008. He said that the defendant denied any involvement in the homicide, telling him that he had bought marijuana from the victim on August 19, 2008, but by 9:15 p.m. was back home and in for the night. The defendant also denied owning a gun. Later, Sergeant Max received Tracy Taylor's cell phone records, which revealed that a call had been placed from her phone to the victim at 11:05 p.m. on August 19, 2008, which had hit off a cell phone tower located only a couple of blocks from the crime scene.

On cross-examination, Sergeant Max acknowledged that there were several calls back and forth that night between the victim's phone and Tracy Taylor's phone, including two short duration calls from Tracy Taylor's phone to the victim's phone that were placed after the shooting. On redirect examination, he said that the call history of Ms. Taylor's phone did not reflect those calls and that the defendant later told him that he had deleted the victim's number from the phone.

Detective Michael Garner of the Memphis Police Department's Investigative Support Unit testified that on August 27, 2008, he and his partner were instructed to escort the defendant to a lot near Hamilton Street where, according to the defendant, Courtney Bishop had thrown the gun used in the homicide out of their car window. The officers were unable to locate the weapon in that lot, however, and as they continued to drive about the area, the defendant asked him to pull over, telling him that he knew where the gun was and wanted

to talk to Detective Ragland about it.

Lieutenant Barry Hanks of the Memphis Police Department testified that he used Tracy Taylor's cell phone records during a third interview with the defendant on August 22, 2008, to show him that he had to have been in the vicinity of the victim's home, rather than at his own home, when he telephoned the victim shortly before the shooting. He said that the defendant responded by looking down and saying, "[Y]ou got me, don't you[?]" The defendant then gave a statement detailing his participation in the crime. In the statement, the defendant said that he drove Courtney Bishop to the victim's home, using Tracy Taylor's vehicle, with the intention to rob the victim. The defendant also admitted that he supplied the gun used in the robbery. He claimed, however, that he began to have second thoughts about the robbery once they reached the victim's home and was not present when Bishop shot the victim. The defendant's statement reads in pertinent part:

> I was riding down Brower and I seen Courtney [Bishop]. He was standing outside and I had stopped to pick him up. We was tripping about some money and he got in the car. That's when [the victim] called about 30 minutes after [Bishop] got in the car. That's when we decided to try and take [the victim's] money. I rode around for a minute thinking this is wrong. This ain't it. But it was more like I guess we need to do because we both needed some money. As I drove around, I parked the car for a minute. We jumped out and walked up Cella Street for a minute. I was really contemplating on should we do it, should I not 'cause I know him and I've never did anything like that before, never. Really, I got cold feet and I left the phone in the car to go back to the car to buy some time to think. Walking back to the car, that's when I decided it wasn't worth it. That's when I guess [the victim] come out of the house and I heard a shot. [Bishop] came running towards me and I said what the fuck did you do – what the fuck you do? And he said he shot him in the leg. I said you didn't kill him, did you? And he said naw, man, 'cause he reached for his leg. While we were in the car, we driving off by this time. The next day I seen the news and they said [the victim] was dead.

The defendant said that he drove both to and from the victim's house and that he knew the victim had money because the victim had been trying to buy some marijuana.

Dr. Lisa Funte, a medical examiner with the Shelby County Regional Forensic Center who reviewed the autopsy report of the victim's body, testified that the cause of death was a single gunshot wound to the chest.

Lieutenant Bart Ragland of the Memphis Police Department testified that on August 27, 2008, he checked the defendant and Bishop out of jail in order for them to direct him and other officers to the location of the murder weapon. He said that when the officers were unable to locate the weapon at the place indicated, Bishop was driven back to jail. In the meantime, the defendant, who had asked to speak to him, divulged that he had given the weapon to a third individual. Lieutenant Ragland then contacted that person, who dropped off the weapon in the bushes outside a restaurant down the street from a police station. Lieutenant Ragland identified a photograph of the weapon, which had previously been identified by Tracy Taylor as one with which she was familiar, as the .357 revolver that he had recovered from the bushes outside the restaurant. He said that both the weapon and the bullet that had been recovered from the victim's body were transported to the Tennessee Bureau of Investigation ("TBI") laboratory for testing.

TBI Special Agent Cervinia Braswell, an expert in firearms identification who conducted the testing of the bullet and gun, testified that the bullet recovered from the victim's body was fired through the barrel of the gun.

Sergeant Joe Stark of the Memphis Police Department's Homicide Unit, who participated in the defendant's August 22, 2008 statement, testified that the defendant never indicated during that interview that he was under the influence of marijuana, codeine/cough syrup, or any other mind- or mood-altering substance at the time of the shooting. He acknowledged on cross-examination, however, that he never asked the defendant whether he had been under the influence of any drugs on August 19.

### Defendant's Proof

Lieutenant Ragland, recalled as a witness for the defense, testified that Tracy Taylor's cell phone records indicated that the victim had made an outgoing call to Tracy Taylor's phone at 11:05 p.m. on August 19, 2008, which was not reflected in the caller identification section of the victim's cell phone.

The defendant testified that on the day of the shooting he smoked marijuana and consumed some Promethazine with codeine, which he mixed in juice with two Xanax bars. Sometime in the afternoon, he went to the victim's house, where he purchased a quarter-ounce of marijuana that he took home and smoked with his girlfriend, Tracy Taylor, before she had to leave for a 4:00 p.m. appointment. In addition to the marijuana, he consumed more Promethazine and Xanax that afternoon. His girlfriend returned home at about 8:00 p.m. and he smoked another marijuana cigarette with her before he, in turn, left home again, taking her car and cell phone because his own phone had been disconnected for nonpayment.

-6-

The defendant testified that as he was driving around the Orange Mound neighborhood, Courtney Bishop flagged him down and the two shared a marijuana cigarette while riding around together. He then dropped Bishop off on the street and met one of his marijuana suppliers, who provided him with a pound of marijuana on consignment, which he took to the victim at the victim's home. The victim was unhappy with the quality, however, so he left with the marijuana. As he was driving around trying to find a different buyer, he spotted and picked up Bishop again. Neither he nor Bishop had any money, but both needed some, and at some point as they were sitting in the car together smoking yet more marijuana, Bishop suggested they could take money from the victim. The defendant said that he rejected the idea because it was not the right thing to do. As Bishop continued to talk about it, the defendant pointed out that Bishop did not even have a gun. In response, Bishop picked up the defendant's loaded gun, which the defendant kept by his console for protection, and told the defendant that he was going to use it to commit the robbery. The defendant said that he told Bishop "no" and that he could not do that to the victim, whom he had known since the victim was a child.

The defendant testified that he later called the victim to see if he could sell him another quarter-ounce of marijuana on credit. He said he parked down the street from the victim's house and was trying to reach him on the cell phone when Bishop suddenly jumped out of the vehicle and began walking toward the victim's home. He followed after him, calling him back to the car and asking what he was doing. He then heard a gunshot and saw Bishop running back toward the car. He panicked, ran back to the car with Bishop, and drove both of them from the scene. He asked Bishop what he had done, and Bishop told him that he had shot the victim in the leg.

The defendant testified that he dropped Bishop off and went home, where he twice called the victim to check on his welfare. No one answered, and the next morning he heard on the television news that there had been a shooting death on Cella. The defendant testified that he did not call the police or seek help for the victim because he was frightened. The defendant described his feelings of anguish and remorse at the death of the victim and said that he never intended for him to be robbed, much less shot. He also said that he was so upset about the shooting that he vomited in the car upon reaching his home that night, and again after he went inside the home.

On cross-examination, the defendant acknowledged he told police, in his statement, that he had planned to rob the victim but then got "cold feet." He further acknowledged that he never said anything about having been under the influence of drugs at the time of the shooting.

**State's Rebuttal Proof**

Mareo Taylor testified that he saw the defendant at his home at about 8:00 p.m. on the night of the shooting but did not see him earlier in the afternoon, despite having been home for almost the entire day.

Tracy Taylor testified that she noticed no unusual smells or signs of recent cleaning in her vehicle when she drove it to work on the morning of August 20, 2008.

Sergeant Joe Stark and Lieutenant Bart Ragland each testified that the defendant never told them that Bishop had taken his gun out of his console, as opposed to his having given it to him, or that he had tried to stop Bishop from committing the robbery.

## ANALYSIS

### I. Criminal Responsibility Jury Instruction

The defendant first contends that it was plain error for the trial court to grant the State's motion to omit a portion of the pattern jury instruction on criminal responsibility. The State responds by arguing that the defendant cannot show that the omitted portion of the charge resulted in plain error. We agree with the State.

In order for us to find plain error:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

-8-

The trial court granted the State's request to omit the following paragraph of the pattern jury instruction on criminal responsibility: "In deciding criminal responsibility of the defendant, the jury may also take into consideration any evidence offered that the defendant attempted to thwart or withdraw from any of the offenses that followed from the original offense." T.P.I. Crim. 3.01. In granting the State's request, the court concluded that the above portion of the criminal responsibility instruction was irrelevant to the case because there was no evidence of any other offense that followed from the original, concurrent offenses of attempted aggravated robbery and felony murder. The trial court compared the case at bar to a hypothetical case involving a pair of bank robbers charged with robbery, evading arrest, aggravated assault, and fleeing the scene of an accident. The court reasoned as follows:

> This jury charge of criminal responsibility talks about everyone involved if they have agreed to be involved in a criminal action, everyone is responsible for the actions of each other. Now this particular paragraph talks about things that occurred after the original offense. . . .

> Now if coming out of the bank . . . one of these two robbers . . . decides I don't want anymore of this, I'm not getting in the car with you, should he be held responsible for the actions of the driver that drove away, rammed the police car, shot at the police officers? Now he had clearly abandoned. He withdrew from the offenses that followed from the original offense. That seems like it makes sense to me. There's only one offense here [in the case at bar]. There's only one really. I mean, we have an attempted aggravated robbery coinciding or concurring with the homicide. . . . So there wasn't . . . any other offenses that followed from that original offense.

Based on the record, we agree with the State that the requirements for a finding of plain error are not met in this case, as the defendant cannot show that a clear and unequivocal rule of law was breached by the trial court's omission of the paragraph, that a substantial right of his was affected, or that consideration of the alleged error is necessary to do substantial justice. The closing arguments are not included in the record. We note, however, that the trial court informed defense counsel that she was free to argue in closing that the defendant had withdrawn from the robbery before the offenses occurred. Moreover, as the State points out, the court instructed the jury on the lesser-included offenses of facilitation of the indicted offenses, giving the jury an opportunity to find the defendant guilty of a lesser role in the crimes. Accordingly, we conclude that the defendant is not entitled to plain error review on this issue.

## II. Sufficiency of the Evidence

The defendant also challenges the sufficiency of the evidence in support of his convictions. Specifically, he argues that there was insufficient proof of his intent to participate in the underlying felony of attempted aggravated robbery. In support, he asserts that "[t]here was no evidence put forth which would constitute a substantial step on the defendant's part towards the commission of an [a]ggravated [r]obbery or [r]obbery." He also cites evidence of his extensive drug use on the day of the shooting to argue that he was incapable of forming the requisite intent for the crimes. The State argues that there was sufficient evidence from which the jury could have found him guilty of the offenses beyond a reasonable doubt. We, again, agree with the State.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2) (2010). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts." Id. § 39-13-202(b). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999).

Aggravated robbery is defined as the intentional or knowing theft of property from the person of another by violence or putting the person in fear that is accomplished with a deadly weapon or where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401(a), -402(a). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3). "Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense." Id. § 39-12-101(b).

Finally, a person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2). Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. State v. Caldwell, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002).

The defendant argues that he did not take any substantial steps toward the commission of the offense. However, when viewed in the light most favorable to the State, the evidence shows the following: that the defendant discussed with Bishop the possibility of robbing the victim for the cash he knew the victim, a marijuana dealer, had on his person; provided Bishop with a revolver to use in the robbery; drove himself and Bishop to the victim's neighborhood, circling the block several times before finally stopping his car down the street from the victim's home; lured the victim outside under the pretense of either buying more marijuana for his personal use or selling him a large bag to supply his business; fled with

-11-

Bishop following the attempted robbery and shooting; and later disposed of the murder weapon. By convicting the defendant of the indicted offenses, the jury obviously credited his statement to police, in which he admitted his intent to participate in the robbery, over his trial testimony in which he disavowed any knowledge of Bishop's intentions to rob the victim. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions for felony murder and attempted aggravated robbery.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE