# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 3, 2013 Session

## STATE OF TENNESSEE v. GARY HAWKINS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-05793     Mark Ward, Judge**

---

**No. W2012-02185-CCA-R3-CD  -  Filed April 17, 2014**

---

Defendant, Gary Hawkins, was convicted of first degree felony murder in the perpetration of aggravated child neglect and aggravated child neglect following a jury trial. Defendant received a life sentence for the murder conviction and a concurrent sentence of 22 years as a violent offender for the aggravated child neglect conviction. In this direct appeal, Defendant contends that the evidence was insufficient to support his convictions and that the trial court erred by allowing evidence of a prior conviction for child abuse into evidence. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, and JEFFREY S. BIVINS, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Gary Hawkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; Jennifer Nichols and Eric Christensen, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts*

The victim in this case, S.I., was the 18-month-old daughter of Shamira Ivory, who lived with Defendant at the time of S.I.'s death. Shamira Ivory was pregnant with S.I. when she moved to Memphis from Atlanta in December, 2006. Ms. Ivory testified that while living in Georgia, she gave birth to a son who was removed from her custody at the age of six months due to Ms. Ivory's lack of stability and mental health issues. Ms. Ivory had "two

or three" more children removed from her custody at birth. She testified that she moved to Memphis before S.I.'s birth so that the baby would not be taken by authorities. When Ms. Ivory first moved to Memphis, she lived with her mother, Mary Richardson. She then moved in with a cousin for three months. S.I. was born on February 19, 2007, while Ms. Ivory was living with her cousin. Ms. Ivory later lived with a man named Bobby Torrence for a year. She testified that during that time, S.I. was healthy except for an ear infection and that she received regular "well baby" examinations. Ms. Ivory missed an appointment, however, for Ivory to be examined for "low weight gain." Ms. Ivory and Torrence separated, and she moved in with Tyrone McNeil, by whom she became pregnant. Ms. Ivory subsequently left McNeil and was homeless until she moved into a home owned by her adoptive mother, Vera Corley. Ms. Ivory and S.I. lived there with Ms. Corley's son and daughter. Defendant also lived there and slept on the couch. Ms. Corley's son and daughter moved out of the house in early September.

Ms. Ivory and Defendant began a relationship after she moved into the house. Ms. Ivory testified about an incident when she and Defendant were having sex while S.I. was on the bed with them. S.I. touched Defendant and Defendant "said it felt good to him." Ms. Ivory did not tell police about the incident because she was afraid of losing custody of S.I. Ms. Ivory testified about another incident when Defendant kicked Ms. Ivory in the stomach while she was pregnant because he wanted her to get off the couch. On another occasion, Ms. Ivory came home and Defendant "grabbed [her] and smelled [her] private part" because Defendant "thought [Ivory] had been sleeping with Big Homey [Ralphael Harris]."

On September 17, 2008, S.I. was fine when she woke up that morning. Ms. Ivory stayed in the bedroom while Defendant fed S.I. Mexican food. S.I. then went to the bedroom and stayed with Ms. Ivory until 8:00 p.m. When they got up, Ms. Ivory made pancakes and fed S.I. at the dining room table. She testified that S.I. ate well, was playing, and had no bruises on her stomach. At around 9:00 p.m., Ms. Ivory left S.I. with Defendant, while Ms. Ivory went to a store to buy cigarettes. Ms. Ivory's friend, Ralphael "Big Homey" Harris, drove her to the store. She testified that she was gone for approximately 10 to 15 minutes. Ms. Ivory told police that S.I. was "screaming and hollering" when she left to go to the store. She testified that S.I. was "spoiled" and always cried when Ms. Ivory left her.

Ms. Ivory testified that when she returned home from buying cigarettes, she saw S.I. lying on the couch "covered in throw up." Defendant was sitting on the other couch, and he told her the baby had vomited. Ms. Ivory got a towel to clean S.I. She saw two small bruises on S.I.'s stomach. Ms. Ivory left the house again and walked to Walgreen's to buy Sprite and Pedialyte. She testified that she "was worried but [S.I.] usually throws up anyway. She has a problem with that anyway." Ms. Ivory thought S.I. had a stomachache. When she returned from the store, she tried to give S.I. the Pedialyte, but S.I. would not swallow. S.I.'s eyes

-2-

were rolling back in her head, and her head was moving back and forth. S.I. was unresponsive when Ms. Ivory splashed water on her face and rubbed ice on her forehead. Ms. Ivory called Ms. Corley, who told her to call 911. Ms. Ivory testified that Defendant also told her to call 911, but Defendant did not seem very concerned. Ms. Ivory called 911, and Defendant left when they heard sirens.

Ralphael Harris testified that he went to the house where Defendant and Ms. Ivory lived, looking for Ms. Ivory's adoptive brother. Defendant answered the door and told him that Ms. Ivory was in the bathroom. Harris stayed on the front porch because he and Defendant were "like water and oil." Harris testified that Defendant was jealous of him. Ms. Ivory offered to buy Harris "loose" cigarettes in exchange for a ride to the store. When Ms. Ivory came to the door, Harris saw S.I. "tagging along at [her] leg." He testified that the child "wasn't as cheerful as she always would be" but that she "looked healthy." Harris drove Ms. Ivory to the store, waited while she made her purchase, and drove her back home. They were gone for approximately 12 minutes.

Paramedics responded to a call made at 11:29 p.m. They found S.I. lying on her back on a couch, and she was unresponsive, had no pulse, and was not breathing. They began resuscitation. S.I. remained unresponsive. Paramedic Patrick McDevitt observed that S.I.'s abdomen was distended and bruised. Ms. Ivory told McDevitt that those "spots" had just come up. Paramedics transported S.I. to the hospital. Dr. James Anderson O'Donnel, II, testified that S.I. arrived at the emergency room "in full cardio pulmonary arrest" and was receiving chest compressions and being ventilated. Dr. O'Donnell administered several doses of epinephrine to try to restart S.I.'s heart, but was unsuccessful. Shortly after midnight, Dr. O'Donnell stopped resuscitation efforts.

Ms. Ivory told investigators that she went to the store and returned home to find S.I. not feeling well. She stated that she then went to Walgreens to buy Sprite and Pedialyte, and that she left S.I. home with Defendant both times. Ms. Ivory gave investigators her receipt from Walgreens. Investigators also interviewed Ralphael Harris, who stated that he picked up Ms. Ivory at her house and drove her to the store to buy cigarettes. Sergeant Joseph Peel reviewed "about four hours worth of video" from the store, but did not see Ms. Ivory or Harris enter the store. Sergeant Peel also reviewed video from Walgreens that confirmed that Ms. Ivory entered the store at 10:07 p.m. and purchased Pedialyte and Sprite 14 minutes later. The Walgreens store was located a third of a mile from Ms. Ivory's house.

Sergeant William Merritt, of the Memphis Police Department homicide squad, interviewed Defendant on September 18, 2008. Defendant stated that S.I. ate pancakes around 8:00 p.m., and an hour later the child began to vomit. He stated that he told Ms. Ivory to call 911, but Ms. Ivory was afraid of losing custody of S.I. Defendant stated that he, Ms.

Ivory, and S.I. were home all day. Sergeant Merritt confronted Defendant about Ms. Ivory's statement that she had left the house twice to go to the store, and Defendant "became pretty agitated, very angry, very argumentative." Defendant told Sergeant Merritt that he was never alone with S.I. because he was falsely accused of breaking a child's leg in 1996 and went to prison for it. Defendant also stated that he did not wait for paramedics to arrive "because the child was not his and was not his problem."

The manager at the McDonald's where Defendant worked testified that Defendant was scheduled to work at 6:00 a.m. on September 18, 2008. Defendant called between 11:00 p.m. and 12:00 a.m. and said that he would not be able to work "because something happened at home." She testified that Defendant sounded "normal" and that he "always had a loud . . . excited type voice."

Lieutenant Donald Crow testified that after detectives took Ms. Ivory's statement, and Ms. Ivory had been released, he answered a phone call from Latasha Frazier, who sounded "frantic," stating that Ms. Ivory was "trying to leave town," that police "needed to stop her," and that Ms. Ivory had admitted to killing S.I. Frazier told Lieutenant Crow that she had seen Ms. Ivory abuse the child and that five other children had been removed from Ms. Ivory's custody in another state. Lieutenant Crow, of the felony response unit, passed the information to the homicide unit. He testified that homicide detectives did not follow up with an interview of Frazier.

Latasha Frazier testified that she knew Ms. Ivory from "the neighborhood," and she never saw Ms. Ivory abuse S.I.. She testified that Ms. Ivory moved away from the neighborhood when S.I. turned one year old. She saw Ms. Ivory with S.I. when Ms. Ivory came back to the neighborhood for visits, and S.I. looked normal and healthy.

Ms. Frazier testified that a mutual friend, Kristina Owens, called her around 6:00 a.m. on September 18, and told her that Ms. Ivory was at Ms. Owens' house and the "baby had got killed." Frazier and Owens arranged a three-way call with Ms. Ivory, and Ms. Ivory stated that "she was scared and she was trying to get some money so she can go out of town." Frazier then called the police and reported that Ms. Ivory planned to leave town. Frazier denied telling Lieutenant Crow that she saw Ms. Ivory abuse S.I., but she acknowledged that she told him Ms. Ivory had five other children who were taken from her custody. Frazier also denied telling Lieutenant Crow that Ms. Ivory had admitted killing the baby. About an hour after Frazier called, police picked her up, and she directed them to the house where Ms. Ivory was located.

Kristina Owens testified that Ms. Ivory came to her house on the morning of September 18 and told her that Defendant killed S.I. Ms. Ivory said that she left S.I. with Defendant while she went to the store, and when she returned S.I. was throwing up.

Dr. Karen Elizabeth Chancellor, Chief Medical Examiner for Shelby County, performed an autopsy on the victim. Dr. Chancellor testified that at the time of her death, S.I. weighed 21 pounds and was 21 inches in length. Dr. Chancellor testified that S.I. was "small for her age" and that she was "in the lower fifth percentile" of children her age for weight and height. Dr. Chancellor observed scars and healing scratches on S.I.'s head, arm, and abdomen. Dr. Chancellor observed multiple bruises on S.I.'s abdomen and chest. There were also bruises on both lungs and blood in her abdominal cavity and chest cavity. There were multiple tears of the small intestine. Dr. Chancellor observed discoloration on the left side of S.I.'s forehead. An internal examination revealed that there was an area of hemorrhaging to the deep scalp tissue, causing the discoloration. Dr. Chancellor found bruises on the internal tissue in S.I.'s thighs that were not visible externally on her skin. Dr. Chancellor determined that S.I.'s injuries were caused by blunt force trauma as a result of multiple impacts. Dr. Chancellor opined that S.I. received "at least ten blows to the abdomen and there were separate blows to the chest[, thighs, wrist, and head.]" Dr. Chancellor testified that the bruises on the victim's body appeared to be recent. Dr. Chancellor determined that the manner of death was homicide.

*Analysis*

*Sufficiency of the evidence*

Defendant contends that the evidence is not sufficient to support his convictions for murder in the perpetration of aggravated child neglect and aggravated child neglect. Specifically, Defendant contends that "the testimony at trial did not prove who committed aggravated child neglect especially considering the uncorroborated testimony of the 'accomplice,' Ms. Ivory, and that there was no proof of neglect which caused any further injuries."

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to

demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

The jury found Defendant guilty of first degree murder in the perpetration of aggravated child neglect. *See* Tenn. Code Ann. § 39-13-202(a)(2) (2012). As applicable to the facts of this case, aggravated child neglect is child neglect that results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1). A person commits child neglect who "knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(b). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

Defendant asserts that no evidence was presented "to corroborate the allegations that Defendant was involved in any way in the death of the child." Ms. Ivory was an accomplice because she was indicted for the same offenses as Defendant. She testified against Defendant at trial. The State responds that evidence was presented to corroborate Ms. Ivory's testimony that the victim became ill after she was left alone in the care of Defendant.

It is true that convictions may not be based solely upon the uncorroborated testimony of accomplices. *See State v. Robinson*, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate such testimony. *See State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). More specifically, precedent provides that:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with

the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must[,] of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

*State v. Griffis*, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (quoting *Sherrill v. State*, 204 Tenn. 427, 321 S.W.2d 811, 815 (Tenn. 1959), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013)). In addition, our courts have stated that:

> The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

*Id*. at 589 (footnotes omitted). Furthermore, we note that the question of whether an accomplice's testimony has been sufficiently corroborated is for the jury to determine. *See id*. at 588; *State v. Maddox*, 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997).

We conclude that Ms. Ivory's testimony was sufficiently corroborated. Defendant's statement to Sergeant Merritt corroborated Ms. Ivory's testimony that Defendant, S.I., and she were home all day, that no one else was present at the house on that day, and that S.I. began vomiting about an hour after eating pancakes that night. Defendant also confirmed Ms. Ivory's testimony that he left the house before the ambulance arrived. Ralphael Harris corroborated Ms. Ivory's testimony that he drove her to the store to buy cigarettes and a drink around 9:00 p.m., that Defendant was jealous of Harris, that S.I. was upset that Ivory was leaving, and that S.I. appeared healthy before they left. Sergeant Peel's review of store surveillance video from Walgreen's also corroborated Ms. Ivory's testimony that she left Defendant alone with the victim. The proof establishing Defendant's opportunity to commit the crime was sufficient to corroborate Ms. Ivory's testimony.

Defendant also asserts that "there was no trial testimony that defendant directly caused the death of the child or neglected the child." It is well-established that a defendant may be convicted based upon direct evidence, circumstantial evidence or a combination of both. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v.*

*Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both direct and circumstantial evidence are treated the same when weighing the sufficiency of such evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). Even though different forms of evidence may establish convictions, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *Id*. at 379. As such, all reasonable inferences from the evidence are to be drawn in favor of the State. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *see Tuggle*, 639 S.W.2d at 914.

Here, viewed in a light most favorable to the State, the evidence established that Defendant was alone with the victim for about 15 to 20 minutes when Ms. Ivory left with Harris. The victim was crying when Ms. Ivory left the house, but appeared otherwise healthy. Defendant was jealous of Harris and had previously accused Ms. Ivory of having sex with Harris. When Ms. Ivory returned from the store, the victim was lying in her own vomit and appeared very ill. Ms. Ivory left the victim alone with Defendant again when she went to Walgreen's to buy Pedialyte for the victim. After Ms. Ivory returned from the store, the victim became unresponsive, and Ivory called 911. Defendant left the house before paramedics arrived. The medical proof established that the victim suffered multiple blunt force trauma injuries to her abdomen, chest, and head, causing internal bleeding, which resulted in her death, and that the victim's injuries were recently inflicted. From the evidence presented, the jury could reasonably infer that Defendant abused the victim and that his actions caused serious bodily injury to the child and resulted in her death. *See* Tenn. Code Ann. §§ 39-13-202(a)(2); 39-15-401(b); 39-15-402(a)(1).

Defendant also contends that the evidence was insufficient to prove that he was criminally responsible for the conduct of another, that Defendant delayed in seeking medical care for the child, or that he owed a duty of care to the victim. Defendant's argument is based upon the premise that he was convicted under a theory of criminal responsibility for the acts of another. The State responds, however, that Defendant was directly responsible for S.I.'s injuries, and the evidence was sufficient to sustain his convictions.

In Tennessee, "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender of the crime for the purposes of due process and our criminal law." *Id*. at 171.

Generally, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person

is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that a person is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." In order to be found criminally responsible, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002).

Although the trial court instructed the jury as to criminal responsibility, Defendant was charged as the principal actor in this case. The State's theory at trial, as evidenced by the State's opening statement, closing argument, and the proof presented by the State, was that Defendant's actions caused the victim's death. Defendant's argument on appeal is premised upon the belief that he was convicted under a theory of criminal responsibility. However, that is not the case here.

The trial court correctly instructed the jury as follows: "A defendant is criminally responsible as a party to a criminal offense *if the offense was committed by the defendant's own conduct*, by the conduct of another for which the defendant is criminally responsible or by both." (Emphasis added). It is clear from the record that Defendant was charged with felony murder for the death of the victim while perpetrating aggravated child neglect, which is defined earlier in this analysis. Defendant's argument that the evidence is insufficient to prove that he "'solicit[ed], direct[ed], aid[ed], or attempt[ed] to aid another person to commit the offense' of aggravated child neglect" is misplaced.

Defendant also argues that the State failed to prove that Defendant caused the victim's death by delaying medical care for her. Defendant cites *State v. John Barlow*, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772 (Tenn. Crim. App., Apr. 26, 2010). In *Barlow*, the defendant was convicted of aggravated child abuse and aggravated child neglect. A panel of this court reversed the defendant's conviction for aggravated child neglect after finding that the State failed to prove its theory that Barlow's delay in seeking medical attention for the victim constituted aggravated child neglect because it worsened the victim's brain injury, which was the basis for the aggravated child abuse conviction. *Id*. at *11. The State, in this case, pursued a conviction based on two alternative theories of culpability, murder in the perpetration of aggravated child neglect and murder in the perpetration of aggravated child abuse. However, both offenses were based on the same criminal behavior, Defendant's beating of the victim which resulted in the victim's death. The jury convicted Defendant of the former, murder in the perpetration of aggravated child neglect, which we have already concluded is supported by the evidence. The State did not present any proof or argument

demonstrating that the harm to the victim resulted from Defendant's delay in seeking medical treatment for her. Defendant's argument is again misplaced.

Likewise, Defendant's assertion that the State failed to prove that Defendant owed a legal duty of care to the victim is also misplaced. Defendant relies upon *State v. Larry E. Rathbone and Veronda Gean Fleeman*, No. E2007-00602-CCA-R3-CD, 2008 WL 1744581 (Tenn. Crim. App., Apr. 16, 2008), in which a panel of this court reversed defendant Fleeman's convictions for criminal responsibility for child rape, attempted child rape, and aggravated sexual battery because the State failed to establish that Fleeman had a legal duty to protect the victim from the harm caused by her co-defendant Rathbone. In that case, unlike this case, Fleeman was charged and convicted under the theory of criminal responsibility, specifically that she had a duty to prevent the commission of the offense. *See* Tenn. Code Ann. § 39-11-402(3). In that case, evidence was presented that Fleeman, Rathbone's girlfriend, was present when Rathbone committed offenses against the victim, but Fleeman did not say anything or otherwise try to prevent the offenses from occurring. As we have already stated, the State's theory in this case was that Defendant directly caused the victim's injuries, and the evidence presented at trial was sufficient to support his convictions.

*Prior bad acts*

Defendant next contends that the trial court erred by allowing evidence that Defendant was previously convicted of child abuse. Defendant is specifically referring to testimony that during an interview with Defendant, Defendant told detectives that he was not alone with the victim because he would never be alone with a child since he was "falsely accused of breaking a child's leg" in 1996, for which he "went to prison." The State responds that evidence of Defendant's prior conviction was relevant to establish Defendant's identity as the perpetrator and to show Defendant's guilty knowledge.

The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; *see State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting

evidence under Rule 404(b), the rule provides that: (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

In a jury-out hearing, the trial court heard argument by the parties regarding the admissibility of the portion of Defendant's statement to detectives, in which Defendant claimed he was not alone with the victim and that he would never be alone with any child because he was falsely accused of breaking a child's leg in 1996 and went to prison. In denying Defendant's motion to exclude the statement, the trial court found that the evidence was "highly relevant," that the proof of the prior bad act was clear and convincing, and that the probative value of the evidence was not outweighed by any danger of unfair prejudice.

On appeal, Defendant argues that the trial court failed to satisfy the second prong of the test by failing to state on the record a material issue to which the evidence was relevant. The State responds that Rule 404(b) requires the trial court to make such a finding only upon request, and Defendant did not make a request. *See* Tenn. R. Evid. 404, Advisory Comm'n Cmts. ("Then the judge must decide what material issue other than character forms a proper basis for relevancy. If the objecting party requests, the trial judge must state on the record the issue, the ruling, and the reason for ruling the evidence admissible."). The trial court found the objected to statement to be relevant as to Defendant's "explanation," implicitly his explanation for why he was never alone with the victim. The trial court gave the following jury instruction, which addresses the material issue for which the trial court found the evidence to be relevant, after the evidence was presented through Sergeant Merritt's testimony:

> If you find from the proof that the defendant has committed a crime other than that for which he is on trial you may not consider this evidence to prove his propensity to commit the crime that he is on trial for. This evidence may only be considered by you for the limited purpose of determining whether it provides the complete story of the crime, and is necessary for a complete account thereof and/or if it tends to establish or relates to the defendant's denial of his guilt, motivation and explanation of his actions and his denial of his opportunity for or lack of opportunity to commit the crime.

We conclude that the trial court substantially complied with the procedural prerequisites of Rule 404(b) in this case. "If the procedures in Rule 404(b) are substantially

followed, the trial court's decision will be given great deference and will be reversed only for an abuse of discretion." *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002). An abuse of discretion only occurs if the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (citations omitted).

In his statement to detectives, Defendant claimed that he was never alone with the victim and offered a reason for his denial that he was not alone with her. The objected to testimony regarding a portion of Defendant's statement is as follows:

> [Sergeant Merritt]: [Defendant] told us that he was never alone with her. I asked him why and he told me that back in 1996 that he was falsely accused of breaking a child's leg, that he went to prison for that and that after that he made it a point that he was never going to be with anyone else's child or a child that was not his. He was not going to be alone with a child that was not his.

A material issue at trial was whether Defendant was alone with the victim during the time period when the fatal injuries were inflicted upon the victim. In his statement to police, Defendant denied that he was ever alone with the victim during the pertinent time period, and the objected to statement is relevant to support Defendant's assertion that he was not alone with the victim. In addition, the statement is relevant to show that Defendant left the scene when he heard the sirens because he had been previously "falsely accused." The fact that these examples of relevancy might under some circumstances usually cause a defendant, rather than the State, to offer the proof is not the determinative factor. If evidence is relevant, its relevancy does not depend upon which party elicits the proof. However, even if relevant to prove some material fact other than "propensity" evidence, in order to be properly admissible the proof must get over the hurdle of Tennessee Rule of Evidence 404(b)(4), which provides that the trial court "*must* exclude the evidence if its probative value is outweighed by the danger of unfair prejudice." (Emphasis added).

On appeal, the State asserts that the objected to statement was relevant to show Defendant's identity as the person who committed the murder and the aggravated child neglect of the victim and to show Defendant's "guilty knowledge" that he had committed the offenses and/or that the offenses had been committed. In its brief the State offers the following argument in support of this theory:

> The defendant's statement was relevant on the issue of the defendant's identity and his guilty knowledge. The defendant claimed that

he did not harm the victim; therefore, the State had the burden of proving that the defendant was, in fact, the individual guilty of these crimes. In his statement to the police, the defendant claimed that he was never alone with the victim and put forth a prior "false accusation" and conviction as the foundation for this claim. Whether the defendant was alone with the victim at the time she was injured was a material issue in this case. Therefore, his statement was relevant to the issues of identity and guilty knowledge – material issues other than propensity. The statement was highly probative and the probative value was not outweighed by the danger of unfair prejudice[.]

We are not persuaded by the State's argument. The only way the statement could show Defendant's identity as the perpetrator and Defendant's "guilty knowledge" is if the statement is used as propensity evidence, i.e., Defendant has done it before and therefore he did it again.

In the trial court, the State's argument as to the relevancy did not mention identity of Defendant or Defendant's guilty knowledge as a basis for relevance. The prosecutor stated,

I understand the Court has to make a ruling, it's certainly relevant. The fact that he made the statement in the first place that he was never alone with the child, the fact that when confronted with evidence from the police officers that we know otherwise that he, again, he stuck by that story then became argumentative and attempted to bolster his story with this explanation it's critical to our case.

I mean, just what he said was the reason that he didn't leave, the fact that he didn't leave that's the whole story, that's the whole picture. It's prejudicial but not overly prejudicial. He could have said any story, that's the one he chose in his mind would best serve to convince the police that he was never left alone with the child.

He could have said I didn't like the child, he could have said I don't babysit children that I didn't father. That's his version of the events, and it just seems, you know – I don't know – to hold that back from the jury the entire reason.

So I guess he's going to take the stand and, you know – if he does – if we don't get it in then he takes the stand and we don't know what happened, whether or not he'll leave the door open but we'll obviously have

-13-

to have some ruling from the Court about what is going to be allowed on cross examination because that's the kind of thing we would normally go into, not the underlying but just being left alone with a child which Shamira Ivory is going to testify he had watched the child on several occasions.

And this was not an unusual circumstance, and this is odd that he would say it didn't happen, hadn't happened since the 90's.

We conclude that the trial court erred by allowing into evidence that portion of Defendant's statement which explains why Defendant was never alone with the victim, under the mandate of Tennessee Rule of Evidence 404(b)(4). In balancing the risk of unfair prejudice against the minimal probative value, we conclude that the danger of unfair prejudice outweighed the probative value of the evidence. However, we further conclude that the trial court's error was harmless. When undertaking a harmless error analysis, this court must consider whether "an error more probably than not had a substantial and injurious impact on the jury's decision-making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008). "The line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict beyond a reasonable doubt." *State v. Carter*, 714 S.W.2d 241, 248 (Tenn. 1986). Here, there was sufficient proof that Defendant was alone with the victim and that the victim's injuries were sustained during that time period. Ms. Ivory testified that she left Defendant alone with the child. Her testimony was corroborated by Mr. Harris' testimony as well as the store surveillance video. Medical proof established that the victim's injuries were inflicted shortly before her death. The evidence established that Defendant refused to render aid to the victim and that he left the house before police and paramedics could arrive. Although this is a very close issue, we conclude that the trial court's error in admitting prior bad act evidence was harmless.

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE